[No. S108099. May 1, 2003.]

STEVEN WHITE, Plaintiff and Appellant, v.
GRAY DAVIS, as Governor, etc., et al., Defendants and Respondents.

HOWARD JARVIS TAXPAYERS ASSOCIATION et al., Plaintiffs and
Respondents, v.
STEVE WESTLY, as Controller, etc., Defendant and Appellant;
CALIFORNIA STATE EMPLOYEES ASSOCIATION, LOCAL 1000,
SEIU, AFL-CIO, CLC, et al., Interveners and Appellants.

## COUNSEL

Law Offices of Richard I. Fine & Associates, Richard I..Fine, Jeremy W. Faith, Genalin Sulat, Carmela Tan, Cheri M. Vu; Jonathan M. Coupal and Trevor A. Grimm for Plaintiff and Appellant and for Plaintiffs and Respondents.

Daniel E. Lungren and Bill Lockyer, Attorneys General, Manuel M. Medeiros, State Solicitor General, Linda A. Cabatic and Andrea Lynn Hoch, Assistant Attorneys General, Louis R. Mauro, Acting Assistant Attorney General, Paul H. Dobson, Keith Yamanaka and Jennifer K. Rockwell, Deputy Attorneys General, for Defendant and Appellant and for Defendants and Respondents Gray Davis et al.

Bion M. Gregory, Richard Thomson; Eisen & Johnston Law Corporation and Marian M. Johnston for Defendants and Respondents Bill Lockyer, Cruz M. Bustamante, Rob Hurtt and Curt Pringle.

Anne M. Giese, Gary P. Reynolds, Daniel S. Connolly and Michael D. Hersh for Interveners and Appellants Gary Gavinski and California State Employees Association, Local 1000, SEIU, AFL-CIO, CLC.

Dennis F. Moss for Interveners and Appellants Professional Engineers in California Government and California Association of Professional Scientists.

Benjamin C. Sybesma, Christine Albertine and Joel H. Levinson for Intervener and Appellant California Correctional Peace Officers' Association.

Carroll, Burdick & McDonough, Ronald Yank, Gary M. Messing, Laurie J. Hepler and Cathleen A. Williams for Intervener and Appellant California Union of Safety Employees.

Lynn S. Carman; Steinberg & Steinberg, Lawrence William Steinberg and Anita Steinberg for Interveners and Appellants Jerome Feitelberg and Alameda Drug Company, Inc.

David P. Lampkin, R. Clayton Seaman, Jr., Jeralyn Keller and Jonathan P. Milberg for California Appellate Defense Counsel as Amici Curiae.

Lynn S. Carman for Frederick S. Mayer as Amicus Curiae.

## OPINION

**GEORGE, C. J.**—Article IV, section 12 of the California Constitution provides in part that "[t]he Legislature shall pass the budget bill by midnight on June 15 of each year," but in recent years the timely adoption of the budget bill in California has proven to be the exception rather than the rule. This proceeding arises out of two taxpayer actions that were filed in the wake of budget impasses that occurred in 1997 and 1998.[1] In the action filed in 1998, the trial court issued a preliminary injunction broadly barring the Controller from making payments from the state treasury in the absence of passage of the budget bill or an emergency appropriation—a preliminary injunction that largely would have shut down government operations in California, but for the Legislature's prompt enactment of an emergency appropriation and the Court of Appeal's subsequent order staying the effect of the preliminary injunction. In the Court of Appeal, the Controller contended that, contrary to the trial court's ruling in the 1998 case, a variety of payments lawfully may be made from the treasury during a budget impasse. Although the ultimate passage of budget bills in 1997 and 1998 rendered the appeals in these cases moot, the Court of Appeal—concluding that the issues presented by this proceeding are important and likely to recur, but will regularly evade timely appellate review—retained the matter to consider this contention.

After briefing and argument, the Court of Appeal, in a lengthy decision, ultimately concluded that the Controller may authorize the payment of state funds during a budget impasse in a variety of circumstances, including (1) when payment is authorized by a "continuing appropriation" enacted by the Legislature, (2) when payment is authorized by a self-executing provision of the California Constitution (for example, the payment of certain funds for public schools under article XVI, section 8.5 of the Constitution, and the payment of elected state officers' salaries under article III, section 4 of the California Constitution), and (3) when payment is mandated by federal law (for example, the prompt payment of those wages mandated by the federal Fair Labor Standards Act, and the prompt payment of benefits mandated under federal food stamp, foster care and adoption, child support, and child welfare programs). (*White v. Davis* (2002) 108 Cal.App.4th 197 [133 Cal.Rptr.2d 691] (*White v. Davis I*); see fn. 14, *post*, p. 563.) The Court of Appeal reversed the trial court's judgment granting a preliminary injunction insofar as the injunction applied to these categories of payments, but otherwise affirmed the order.

---

[1] For convenience, we use the term "budget impasse" to refer, with regard to any year in which the budget bill has not been enacted into law before July 1 (the beginning of the state's fiscal year), to the situation that exists between July 1 and the date the budget bill is enacted into law.

The Controller and a number of state employee unions and associations that had intervened in the lower court actions (hereafter referred to as state employee interveners) filed petitions for review in this court, but the petitions challenged only two aspects of the Court of Appeal's decision. First, both the Controller and the state employee interveners, contending that the Court of Appeal erred in affirming in any respect the trial court's 1998 order granting the preliminary injunction, maintained that the trial court's issuance of a preliminary injunction in this action constituted a clear abuse of discretion in light of (1) prior case law holding that the alleged harm to a taxpayer's interest in the public treasury is insufficient to support the issuance of a preliminary injunction to bar the alleged improper expenditure of public funds, and (2) the circumstance that the harm posed by granting the broad preliminary injunctive relief sought by plaintiffs greatly outweighed the potential harm that would have resulted from denying such injunctive relief pending a full adjudication on the merits. Second, the state employee interveners challenged the Court of Appeal's conclusions regarding the payment of state employee salaries during a budget impasse, contending that the Court of Appeal erred in determining that state law did not authorize the Controller to pay all state employees their full and regular salaries in the absence of a duly enacted budget bill, and erred additionally in concluding that the federal Fair Labor Standards Act required the Controller, during a budget impasse, to pay state employees covered by that law only at the minimum wage rate for hours worked during the impasse.

We granted review to address only the two matters raised in the petitions for review: (1) the procedural question whether the trial court erred in granting a preliminary injunction in the underlying taxpayer action, and (2) the substantive question whether the Controller is authorized to pay state employees their full and regular salaries during a budget impasse.

With regard to the first issue, we conclude that the trial court in the 1998 action abused its discretion in granting a preliminary injunction and that the Court of Appeal erred in affirming in any respect the order granting the preliminary injunction.

With regard to the second issue, we conclude that the trial court erred in ruling that state employees who work during a budget impasse properly may be considered "volunteers" who obtain no right to the payment of salary or wages either under state or federal law, and also that the Court of Appeal erred insofar as that court concluded that state employees' entitlement "to compensation for work performed during a budget impasse does not accrue until the enactment of a budget or other proper appropriation." (*White v. Davis I, supra*, 108 Cal.App.4th 197, 226-227.) Instead, we conclude that

under the applicable California statutes, state employees who work during a budget impasse obtain the right, protected by the contract clauses of the federal and state Constitutions, to the state's *ultimate* payment of their *full* salary for work performed during the budget impasse; that is, when state employees work during a budget impasse, the state becomes contractually obligated *ultimately* to pay employees the full salary they have earned. At the same time, however, we conclude that the Court of Appeal was correct in determining that state employees do not have a contractual right actually to receive the payment of salary *prior to the enactment of an applicable appropriation*, and that the Controller is not authorized under *state* law to pay those salaries prior to such an appropriation. Thus, *state* law contractually guarantees that state employees ultimately will receive their full salary for work performed during a budget impasse, but state law does not authorize the Controller to disburse state funds to the employees until an applicable appropriation has been enacted.

In addition, we conclude that, in light of the requirements of *federal* law, the Controller is required, notwithstanding a budget impasse and the limitations imposed by state law, to *timely* pay those state employees who are subject to the minimum wage and overtime compensation provisions of the federal Fair Labor Standards Act— a category that includes many, but not all, state employees—the wages required by that act.

## I

As noted, this case arises out of two separate taxpayer actions, the first filed in 1997 concerning the 1997-1998 budget impasse (hereafter, the 1997 action), and the second filed in 1998 related to the 1998-1999 budget impasse (hereafter the 1998 action). We briefly describe each of the actions.

## A

On July 25, 1997, Steven White filed the 1997 action against the Governor and numerous other state officials, a taxpayer action alleging the improper expenditure of public funds. On September 22, 1997, White filed a first amended complaint, alleging that the Legislature had failed to pass a budget for the 1997-1998 fiscal year by the constitutionally required date of June 15, 1997, and that from June 15 to August 18, 1997, when a budget finally was enacted, the Controller improperly had disbursed funds from the state treasury to welfare recipients, state employees, members of the Legislature, and other individuals without the enactment of an emergency appropriation bill. The complaint maintained that "[w]ithout any appropriations, the government of the State of California should have closed," and sought declaratory and injunctive relief.

Defendants filed a demurrer to the complaint, and on March 13, 1998, the trial court sustained the demurrer without leave to amend, concluding that the action was moot as to the 1997-1998 fiscal year because a budget for that year had been enacted, and that the action was premature as to the following fiscal year. White filed an appeal from the dismissal of the 1997 action.

B

On June 24, 1998, the Howard Jarvis Taxpayers Association and Steven White (hereafter plaintiffs) initiated the 1998 action, another taxpayer action seeking declaratory and injunctive relief against the Controller. The complaint stated that the Legislature had not passed a budget by June 15, 1998, and asserted that "[t]he Constitution of the State of California does not have any provision to allow the state government to function without a budget, absent emergency bills. Under the Constitution . . . , without an emergency bill, the state government must close." The complaint further alleged that the Controller was likely to disburse funds despite this asserted constitutional restriction, and sought both interim and permanent injunctive relief.

On July 9, 1998, the trial court issued a temporary restraining order barring the Controller from paying out funds absent the enactment of a budget or an emergency appropriation, unless payments were authorized by a continuing appropriation or federal law. Thereafter, the trial court granted intervener status to several state employee unions and associations as well as several individual state employees.[2]

On July 21, 1998, after conducting a hearing, the trial court granted a preliminary injunction barring the Controller from disbursing any funds in the absence of a budget, with the exception of (1) funds properly appropriated prior to July 1, 1998, for expenditure in the 1998-1999 fiscal year, (2) funds properly appropriated pursuant to emergency bills, and (3) payments of minimum wages and overtime compensation required under the federal Fair Labor Standards Act *for work performed prior to July 21, 1998.* In the course of its decision, the trial court determined that state employees who continued to work during the budget impasse after the entry of its order did so as "volunteers," and prohibited the Controller from making any payments for such work. The trial court also found that continuing appropriations "have no constitutional basis and simply represent examples of expenditures from the state treasury that have no unique position over other required

---

[2]The following state employee unions and associations were granted intervener status: California State Employees Association, Service Employees International Union, Local 1000, AFL-CIO, CLC ; Professional Engineers in California Government; California Association of Professional Scientists; California Correctional Peace Officers' Association; and California Union of Safety Employees.

expenditures." As part of its injunctive order, the trial court also ordered plaintiffs to post a $100,000 bond.

The Controller and the state employee interveners immediately appealed from the order granting the preliminary injunction, and requested the Court of Appeal to stay the preliminary injunction by supersedeas.[3] On July 22, 1998—the day after the trial court issued its preliminary injunction—the Legislature enacted an emergency appropriation to fund vital services and pay the salaries of state employees through August 5, 1998. On July 28, 1998, the Court of Appeal issued a writ of supersedeas staying the trial court's preliminary injunction pending consideration of the appeal. That stay has remained in effect throughout the pendency of the appeal. The 1998-1999 budget bill ultimately was passed and signed into law on August 21, 1998.

## C

The Court of Appeal consolidated the appeals from the 1997 and 1998 actions and decided the cases in a single opinion. (*White v. Davis I, supra,* 108 Cal.App.4th 197.) Because the budget bills for both the 1997-1998 and 1998-1999 fiscal years had been enacted prior to the resolution of the appeal, the Court of Appeal turned first to the issue of mootness, dismissing the appeal from the 1997 action as moot but retaining the appeal from the 1998 action for decision. ■ The Court of Appeal explained that an appellate court has " 'discretion to decide otherwise moot cases presenting important issues that are capable of repetition yet tend to evade review' " (108 Cal.App.4th at p. 208, quoting *Conservatorship of Wendland* (2001) 26 Cal.4th 519, 524, fn. 1 [110 Cal.Rptr.2d 412, 28 P.3d 151]), and that the issues presented here "are of profound public significance and arise with some frequency, but escape review with the enactment of a budget." (108 Cal.App.4th at p. 208.)

In addressing the validity of the broad preliminary injunction issued by the trial court in the 1998 action, the Court of Appeal noted that the Controller contended in the trial court and on appeal that there are numerous circumstances under which payment of public funds is authorized even in the absence of the enactment of the annual budget act: (1) when payment is authorized by a "continuing appropriation" enacted by the Legislature, (2) when payment is authorized by a self-executing provision of the California Constitution, and (3) when payment is required by federal law. The Court of

---

[3]At the same time, the Controller and interveners filed petitions for an original writ of mandate in the Supreme Court. This court transferred the petitions to the Court of Appeal, which consolidated them with the appeals in this proceeding and ultimately dismissed the petitions as moot. No one has challenged the Court of Appeal's disposition of those mandate actions.

Appeal proceeded to address each of these categories, emphasizing that its decision was limited to the provisions of law discussed by the parties on appeal, and that its decision did not purport to determine "whether other provisions of law may authorize or mandate the disbursement of funds during a budget impasse." (*White v. Davis I, supra,* 108 Cal.App.4th 197, 206, fn. 1.)

Because the Court of Appeal's discussion of the numerous issues before it reveals the complexity of the task of determining which payments of public funds lawfully may be made during a budget impasse, we believe it is useful to review at some length that court's analysis and conclusions.

### 1. *Continuing Appropriations*

The Court of Appeal initially scrutinized the category of "continuing appropriations." In *California Assn. for Safety Education v. Brown* (1994) 30 Cal.App.4th 1264, 1282 [36 Cal.Rptr.2d 404], the court explained that "[a]n appropriation is a legislative act setting aside 'a certain sum of money for a specified object in such manner that the executive officers are authorized to use that money and no more for such specified purpose.' [Citation.] A continuous [or continuing] appropriation runs from year to year *without the need for further authorization in the budget act.* [Citations.]" (Fn. omitted, italics added.) Government Code section 16304 evidences the Legislature's approval of such appropriations.[4]

---

[4]Government Code section 16304 provides in relevant part: "An appropriation shall be available for encumbrance during the period specified therein, or, if not otherwise limited by law, for three years after the date upon which it first became available for encumbrance. An appropriation containing the term 'without regard to fiscal years' shall be available for encumbrance from year to year until expended. [¶] . . . [¶]

"Appropriations for the following purposes are exempt from limitations as to period of availability in any appropriation, and shall remain available from year to year until expended:

"(a) Payment of interest and redemption charges on any portion of the bonded debt of the state.

"(b) Transfers of money from any fund for the benefit of elementary schools, high schools, community colleges, the University of California, or any interest and sinking fund in the State Treasury.

"(c) Money transferred to revolving funds specifically created by law, including, but not limited to, the Architecture Revolving Fund and the Water Resources Revolving Fund.

"(d) Appropriations available for the acquisition of real property to the extent that such appropriations have been encumbered by the filing of condemnation proceedings on behalf of the State of California prior to the expiration of the period of availability of the appropriation.

"(e) Money transferred to and expendable from funds other than the fund in which originally deposited, pursuant to the provisions of law earmarking or appropriating for expenditure certain classes of revenue or other receipts.

"(f) Continuing provisions of law appropriating for specific purposes certain classes of revenue or other receipts, upon their deposit in a particular fund in the State Treasury or upon their collection by an agency of this state."

As the Court of Appeal noted, the Controller's brief cited a considerable number of statutes and voter-approved initiatives that establish continuing appropriations independent of the budget act, authorizing payments for items such as tax refunds, disability and retirement payments, and payments to bondholders.[5] Plaintiffs did not claim in the trial court or in the Court of Appeal that any of the provisions cited by the Controller were not intended to create continuing appropriations, but rather argued that, as a general matter, continuing appropriations are not constitutionally permissible. The trial court agreed with plaintiffs, and its preliminary injunction barred the Controller from making payments during a budget impasse pursuant to *any* continuing appropriation. The Court of Appeal disagreed with the trial court on this fundamental issue, holding that legislative or voter-approved measures authorizing continuing appropriations independent of the budget act are constitutionally valid.

In reaching this conclusion, the Court of Appeal began by observing that under the California Constitution "[g]enerally, the Legislature 'may exercise any and all legislative powers which are not expressly or by necessary implication denied to it by the Constitution.' (*Methodist Hosp. of Sacramento v. Saylor* (1971) 5 Cal.3d 685, 691 [97 Cal.Rptr. 1, 488 P.2d 161].)" (*White v. Davis I, supra,* 108 Cal.App.4th 197, 212.) In *Methodist Hosp. of Sacramento,* our court explained this fundamental point at greater length: "Unlike the federal Constitution, which is a grant of power to Congress, the California Constitution is a limitation or restriction on the powers of the Legislature. [Citations.] Two important consequences flow from this fact. First, the entire law-making authority of the state, except the people's right of initiative and referendum, is vested in the Legislature, and that body may exercise any and all legislative powers which are not expressly or by necessary implication denied to it by the Constitution. [Citations.] In other words, 'we do not look to the Constitution to determine whether the legislature is authorized to do an act, but only to see if it is prohibited.' [Citation.] [¶] Secondly, all intendments favor the exercise of the Legislature's plenary authority: 'If there is any doubt as to the Legislature's power to act in any given case, the doubt should be resolved in favor of the Legislature's action.

---

[5]In a brief filed in the Court of Appeal, the Controller cited, as a "small sampling" of current enactments authorizing continuing appropriations, the following provisions authorizing continuing appropriations for (1) disability income payments (Unemp. Ins. Code, § 3012), (2) income tax refunds (Rev. & Tax. Code, § 19611), (3) the Local Revenue Fund (Welf. & Inst. Code, § 17600), (4) the Local Public Safety Account (Gov. Code, § 30052, subd. (a)), (5) contributions to the Teachers Retirement Fund (Ed. Code, § 22955), (6) retirement and disability payments (Ed. Code, § 22307), (7) the operations of the California Highway and Infrastructure Finance Agency (Health & Saf. Code, §§ 51000, 50154), (8) the Local Agency Investment Fund (Gov. Code, § 16429.1), (9) bond-related payments (Gov. Code, §§ 15814.16, 15848), and (10) voter-approved general obligation bond payments (Gov. Code, § 8879.10; Pen. Code, § 7428; Pub. Util. Code, § 99693).

Such restrictions and limitations [imposed by the Constitution] are to be construed strictly, and are not to be extended to include matters not covered by the language used.' [Citation.]" (*Methodist Hosp. of Sacramento v. Saylor, supra,* 5 Cal.3d at p. 691.)

The Court of Appeal then turned to the terms of the two state constitutional provisions upon which plaintiffs relied. Article IV, section 12, subdivision (c) of the California Constitution provides in relevant part: "The Legislature shall pass the budget bill by midnight on June 15 of each year. Until the budget bill has been enacted, the Legislature shall not send to the Governor for consideration any bill appropriating funds for expenditure during the fiscal year for which the budget bill is to be enacted, except emergency bills recommended by the Governor or appropriations for the salaries and expenses of the Legislature." Article XVI, section 7, provides: "Money may be drawn from the Treasury only through an appropriation made by law and upon a Controller's duly drawn warrant."

The Court of Appeal observed that "nothing in . . . article IV, section 12, expressly bars continuing appropriations. On its face, section 12 prohibits the Legislature from sending specified appropriation bills to the Governor prior to the enactment of a budget, and it provides for exceptions to this prohibition; it does not otherwise limit the Legislature's authority to enact appropriations." (*White v. Davis I, supra,* 108 Cal.App.4th 197, 212.) Similarly, article XVI, section 7, simply provides that money may be drawn from the treasury "only through an appropriation *made by law* . . . ." (Italics added.) That provision does not limit the form in which an appropriation may be adopted.

In addition to noting that the relevant constitutional provisions do not on their face preclude the Legislature from enacting continuing appropriations, the Court of Appeal further explained that the predecessor to current article IV, section 12—former article IV, section 34—had been interpreted by this court to permit the Legislature to enact continuing appropriations that are available for expenditure independent of the budget act (see, e.g., *Gillum v. Johnson* (1936) 7 Cal.2d 744, 758 [62 P.2d 1037, 108 A.L.R. 595]; *Railroad Commission v. Riley* (1923) 192 Cal. 54, 56-58 [218 P. 415]), that there was no indication that the drafters or the voters intended any change in meaning in this regard when article IV was substantially revised in 1966 and the current provisions of article IV, section 12, were adopted, and that subsequent Court of Appeal opinions have recognized the existence of continuing appropriations (see, e.g., *California Assn. for Safety Education v. Brown, supra,* 30 Cal.App.4th 1264, 1283). (*White v. Davis I, supra,* 108 Cal.App.4th 197, 212-216.) Accordingly, the Court of Appeal concluded that continuing

appropriations are constitutionally permissible, and it set aside the preliminary injunction insofar as it rested on the trial court's contrary determination.[6]

### 2. *Payments Authorized by the State Constitution*

The Court of Appeal next considered the Controller's contentions that a number of provisions of the California Constitution authorize the payment of funds from the state treasury independent of the budget act.

### (a) *Article III, Section 4*

The Court of Appeal first addressed the Controller's contention that the payment of salaries of elected state officers is authorized by article III, section 4, of the California Constitution without a specific budget act appropriation. That constitutional provision states in relevant part: "[S]alaries of elected state officers may not be reduced during their term of office. *Laws that set these salaries are appropriations.*" (Italics added.) The Controller maintained that because the salaries of state officers are set by statute, the Controller may authorize the payment of these salaries independent of a budget act or emergency appropriation.

The Court of Appeal agreed with the Controller's position, explaining that not only did the explicit constitutional language of article III, section 4, establish that the statutes setting those salaries themselves operate as appropriations for purposes of the Constitution, but that this conclusion found support in the decision of *Brown v. Superior Court* (1982) 33 Cal.3d 242 [188 Cal.Rptr. 425, 655 P.2d 1260], which states that "though a bill setting salaries of elected state officers is not an appropriation bill it nonetheless takes effect as an appropriation once it has been enacted." (33 Cal.3d at pp. 249-250, fn. 6.)

### (b) *Article XVI, Section 8*

The Court of Appeal next addressed the Controller's contention that article XVI, section 8 of the California Constitution—a provision establishing a minimum level of education funding enacted as part of the voter

---

[6]The Court of Appeal noted that because the trial court had concluded that continuing appropriations as a general matter are constitutionally impermissible, the trial court did not make individual determinations as to whether each of the particular statutes or laws cited by the Controller validly establish a continuing appropriation. The Court of Appeal further explained that because the trial court did not address the individual continuing appropriations, and because a full showing had not been made regarding those measures, the Court of Appeal would not itself address whether any of the provisions establish continuing appropriations independent of the budget act. (*White v. Davis I, supra,* 108 Cal.App.4th 197, 210.)

initiative popularly known as Proposition 98—authorizes the disbursement of funds independent of a budget act or emergency appropriation. On this point, the Court of Appeal rejected the Controller's contention and agreed with the earlier decision of *County of Sonoma v. Commission on State Mandates* (2000) 84 Cal.App.4th 1264, 1290 [101 Cal.Rptr.2d 784], that "Proposition 98 does not appropriate funds. . . . The power to appropriate funds was left in the hands of the Legislature. Proposition 98 merely provides formulas for determining the minimum to be appropriated every budget year. The state's obligation is to ensure specific amounts of moneys are applied by the state for education." Accordingly, the Court of Appeal concluded that the provisions of article XVI, section 8 "do not constitute a self-executing authorization to disburse funds." (*White v. Davis I, supra,* 108 Cal.App.4th 197, 221.)

### (c) *Article XVI, Section 8.5*

The Court of Appeal next addressed the Controller's argument that article XVI, section 8.5, of the California Constitution—an additional educational funding provision, also adopted as part of Proposition 98—authorizes the disbursement of funds independent of a budget act or emergency appropriation. After analyzing the somewhat complex features of this provision, the Court of Appeal ultimately agreed with the Controller that article XVI, section 8.5 provides an independent basis for the disbursement of funds.

As the Court of Appeal explained, article XVI, section 8.5 operates in conjunction with another provision of the California Constitution, article XIII B, which generally limits governmental spending. "As it was originally enacted, article XIII B required that all governmental entities return revenues in excess of their appropriation limits to the taxpayers through tax rate or fee schedule revisions. In Proposition 98, . . . article XIII B was amended to provide that half of state excess revenues would be transferred to the state school fund for the support of school districts and community college districts." (*Hayes v. Commission on State Mandates* (1992) 11 Cal.App.4th 1564, 1580, fn. 7 [15 Cal.Rptr.2d 547].)

Along with the amendment of California Constitution, article XIII B in Proposition 98, the voters adopted article XVI, section 8.5. Article XVI, section 8.5, subdivision (a) provides that in addition to the education funding required under article XVI, section 8, "the Controller shall during each fiscal year transfer and allocate all revenues available [under the relevant provisions] of article XIII B to that portion of the State School Fund restricted for elementary and high school purposes, and to that portion of the State School Fund restricted for community college purposes, respectively, in proportion

to the enrollment in school districts and community college districts respectively." Article XVI, section 8.5, subdivision (c), in turn, provides that "[f]rom any funds transferred to the State School Fund pursuant to subdivision (a), the Controller shall each year allocate to each school district and community college district an equal amount per enrollment in school districts from the amount in that portion of the State School Fund restricted for elementary and high school purposes and an equal amount per enrollment in community college districts from that portion of the State School Fund restricted for community college purposes." Finally, article XVI, section 8.5, subdivision (d) provides that "[a]ll revenues allocated pursuant to subdivision (a) shall be expended solely for the purposes of instructional improvement and accountability as required by law."

In analyzing whether the provisions of article XVI, section 8.5 authorize the disbursement of funds without the need for a legislative appropriation, the Court of Appeal noted that in *California Teachers Assn. v. Hayes* (1992) 5 Cal.App.4th 1513 [7 Cal.Rptr.2d 699], the appellate court, in discussing this constitutional provision, declared: "The measure is self-executing; it requires no legislative action. . . . [¶] . . . Section 8.5 does not extend the Legislature's spending power to excess revenues; rather it imposes a self-executing, ministerial duty upon the Controller to transfer such excess revenues to a restricted portion of the school fund and thence to allocate such revenues to school districts and community college districts on a per-enrollment basis. Section 8.5 specifically restricts the purposes for which those funds may be expended." (5 Cal.App.4th at p. 1530.)

The Court of Appeal below agreed with *California Teachers Assn.*'s description of the effect of this provision, and held that "[a]s such, article XVI, section 8.5, bears the earmarks of a continuing appropriation entrenched by the voters in the state Constitution. We therefore conclude that this provision contains a self-executing authorization to disburse funds." (*White v. Davis I, supra,* 108 Cal.App.4th 197, 223.)

### 3. *Payments Pursuant to Federal Law*

After addressing the Controller's contentions regarding the permissibility of authorizing payments from the treasury absent a budget bill or emergency appropriation, pursuant to continuing appropriations and various provisions of the California Constitution, the Court of Appeal turned to the third general category asserted by the Controller as providing a basis for the payment of state funds during a budget impasse—payments that are required to comply with federal law.

In analyzing this claim, the Court of Appeal recognized at the outset that in light of the supremacy clause of the federal Constitution (U.S. Const., art.

VI, cl. 2 ["laws of the United States . . . shall be the supreme law of the land; and the judges of every state shall be bound thereby, any thing in the Constitution or laws of any state to the contrary notwithstanding"]), the requirements of federal law necessarily prevail over any restrictions that state law may place on the disbursement of state funds. (See, e.g., *McCulloch v. Maryland* (1819) 17 U.S. (4 Wheat.) 316, 427 [4 L.Ed. 579, 606-607]; *Cipollone v. Liggett Group, Inc.* (1992) 505 U.S. 504, 516 [112 S.Ct. 2608, 2617, 120 L.Ed.2d 407] ["state law that conflicts with federal law is 'without effect' "].) Thus, the Court of Appeal concluded that when federal law places an obligation upon the state promptly to make payments of public funds, the Controller is authorized to make such payments independent of the enactment of a budget bill or emergency appropriation. The Court of Appeal held that the pertinent question in each instance is whether the applicable federal law in fact requires the state to make the payment or payments during the time period in question.

The Court of Appeal then discussed a number of federal statutes asserted by the Controller to require the disbursement of public funds notwithstanding a budget impasse.

### (a) *Fair Labor Standards Act*

The Court of Appeal first addressed the question whether the Controller is required under the Fair Labor Standards Act (29 U.S.C. § 201 et seq.) (FLSA) to disburse funds to pay the salaries of state employees during a budget impasse. The trial court had concluded that the state was required by the FLSA to pay the wages required by that act only for work performed prior to the date of the trial court's preliminary injunction—determining that state employees would be "volunteers" not entitled to compensation with regard to work performed after the trial court issued its injunction. The Court of Appeal rejected this conclusion, determining that the state is obligated to pay in a timely fashion the wages required by the FLSA for all work performed during a budget impasse. That court also concluded, however, that, contrary to the arguments set forth by the state employee interveners, state employees "do not have an entitlement to their full salaries (over and above the compensation required under the FLSA) pursuant to the contract clauses of the United States and California Constitutions." (*White v. Davis I, supra,* 108 Cal.App.4th 197, 223-224.)

Because the question of the payment of state employee salaries during a budget impasse is one of the issues upon which review was sought and granted, we describe in detail the Court of Appeal's resolution of the salary issue.

The Court of Appeal began its analysis by explaining that the FLSA—which by its terms applies to public employers, including a state (29 U.S.C. § 203(d), (e)(2)(C))—requires an employer to pay minimum wages (29 U.S.C. § 206(a)) and overtime compensation (29 U.S.C. § 207(a)(1)) to those employees to whom those provisions apply, and provides for the recovery of unpaid minimum wages, unpaid overtime compensation, and liquidated damages. (29 U.S.C. § 216(b).)[7] The Court of Appeal also noted that the federal courts have held that, as a general matter, " 'the FLSA is violated unless the minimum wage is paid *on the employee's regular payday* . . . .' (*Biggs v. Wilson* (9th Cir. 1993) 1 F.3d 1537, 1541 [cert. den. (1994) 510 U.S. 1081 [114 S.Ct. 902, 127 L.Ed.2d 94]].)" (*White v. Davis I, supra,* 108 Cal.App.4th 197, 224, italics added.)

Although nothing in the FLSA specifically addresses a state's obligation to pay wages required under the act *during a budget impasse,* the Court of Appeal explained that in *Biggs v. Wilson, supra,* 1 F.3d 1537, the Ninth Circuit Court of Appeals squarely held that California had violated the FLSA in July 1990 by failing to pay the wages owed to public transportation employees under the FLSA during a budget impasse. In this proceeding, no one has questioned the validity of the interpretation or application of the FLSA set forth in *Biggs*—namely that under the FLSA, the state is required to pay the wages owed under that act *on the employees' regular payday,* notwithstanding the existence of a budget impasse.

The Court of Appeal noted that although the trial court in this case had acknowledged the *Biggs* decision, the trial court had concluded that under that decision the Controller was authorized to pay the minimum wages and overtime compensation required under the FLSA *only for work performed prior to the date of the preliminary injunction,* because state employees who continued to work after that date were "volunteers" not entitled to compensation under the FLSA. The Court of Appeal reasoned that the trial court apparently had concluded "that a budget impasse nullifies the relationship

[7]The Court of Appeal recognized that the United States Supreme Court recently held that individual employees may not initiate actions under the FLSA against a state that has not waived its immunity under the Eleventh Amendment to the United States Constitution (see *Alden v. Maine* (1999) 527 U.S. 706, 754 [119 S.Ct. 2240, 2266, 144 L.Ed.2d 636]), and that a lower federal court had held that California has not waived this immunity (*Baird v. Kessler* (E.D.Cal. 2001) 172 F.Supp.2d 1305, 1312). The Court of Appeal nonetheless pointed out that the FLSA authorizes the Secretary of Labor to seek the payment of minimum wages and overtime compensation "owing to any employee or employees" under the FLSA (29 U.S.C. § 216(c)) and thus that the state remains obligated to comply with the provisions of the FLSA. (*White v. Davis I, supra,* 108 Cal.App.4th 197, 224, fn. 10; see also *Alden v. Maine, supra,* 527 U.S. at p. 755 [119 S.Ct. at p. 2266] [explaining that the high court's holding in that case "does not confer upon the State a . . . right to disregard the Constitution or valid federal law"].)

between the state and its employees, and that employees who continued to work despite notification of this nullification fall outside the protection of the FLSA." (*White v. Davis I, supra,* 108 Cal.App.4th 197, 224.) The Court of Appeal treated the trial court's ruling as raising three issues: "(1) whether there is a continuing employment relationship between the state and its employees during a budget impasse; (2) whether this relationship, if it exists, falls within the scope of the FLSA; and (3) whether state employees are entitled to payment of their salaries during a budget impasse absent an appropriation, over and above the compensation requirements found in the FLSA." (*Ibid.*) The appellate court proceeded to address each of those issues.

### (i) *Continuing Employment Relationship*

In discussing this issue, the Court of Appeal first recognized that although " '[p]ublic employment, by and large, is not held by contract, but by statute, . . .' " "public employment [nonetheless] may give rise to obligations regarding compensation treated as contractual under the contract clauses of the federal and state Constitutions." (*White v. Davis I, supra,* 108 Cal.App.4th 197, 224-225, citation omitted.)

The Court of Appeal noted that the Legislature had enacted two statutes— Government Code sections 1231 and 1231.1—relating to the status of public employees and to the payment of their salaries in the event of a budget impasse. Government Code section 1231 provides in part: "No state officer or employee shall be deemed to have a break in service or to have terminated his or her employment, for any purpose, nor to have incurred any change in his or her . . . salary or other conditions of employment, solely because of the failure to enact a budget act for a fiscal year prior to the beginning of that fiscal year." Government Code section 1231.1 provides: "Funds from each appropriation made in the budget act for any fiscal year may be expended to pay to officers and employees whatever salary that would have otherwise been received had the budget act been adopted on or prior to July 1, of that fiscal year."

The Court of Appeal then stated: "In interpreting these statutes, we seek a construction that is constitutionally sound. [Citation.] 'Under our Constitution the creation of an enforceable contract with the state requires compliance with the constitutional debt limitation provisions of article XVI, section 1, or a valid appropriation in support of the contract under article XVI, section 7. [Citations.] In this respect our law is consistent with federal law and the law of nearly every state in the Union. [Citations.] Persons who deal with the government are held to have notice of this limitation upon the authority to enter into contracts. [Citation.]' [Citation.]" (*White v. Davis I, supra,* 108 Cal.App.4th 197, 225.)

The Court of Appeal observed that "nothing supports a determination that Government Code sections 1231 and 1231.1 establish an obligation to pay employee salaries in conformity with . . . the debt limitation provisions of California Constitution, article XVI, section 1. [Citation.] Nor do the parties dispute that the salaries at issue here are generally paid pursuant to an appropriation on the general treasury fund, rather than pursuant to a continuing appropriation or constitutional mandate." (*White v. Davis I, supra,* 108 Cal.App.4th 197, 226.)

The Court of Appeal concluded that "[u]nder these circumstances, Government Code sections 1231 and 1231.1 cannot establish an employment relationship that entitles state employees to their salaries during a budget impasse absent an appropriation, given the constitutional limitations that we have described." (*White v. Davis I, supra,* 108 Cal.App.4th 197, 226.) Instead, the Court of Appeal held that "these statutes, if constitutionally sound, authorize a continuing employer-employee relationship during a budget impasse under which entitlement to compensation for work done during the budget impasse arises *only* upon the satisfaction of a *condition precedent*, namely, the enactment of a budget or other proper appropriation." (*Ibid.,* italics in original.)

The Court of Appeal continued: "Although the employer-employee relationship at issue here is ultimately governed by statute, we discern no reason rooted in the state Constitution barring the Legislature from subjecting the entitlement to wages earned during a budget impasse to an analogue of a condition precedent. Thus, the entitlement of state employees to compensation for work performed during a budget impasse does not accrue until the enactment of a budget or other proper appropriation. Furthermore, given the friction of democratic politics—which Government Code sections 1231 and 1231.1 impliedly recognize—state employees assume the risk that satisfaction of this condition may be delayed due to the Legislature's inaction during a budget impasse. [Citations.]" (*White v. Davis I, supra,* 108 Cal.App.4th 197, 226-227.)

In sum, with regard to the question of a continuing employment relationship, the Court of Appeal ultimately concluded that state employees who work during a budget impasse do have a continuing employment relationship with the state, but it is one under which an employee's "entitlement to compensation for work done during the budget impasse arises *only* upon . . . the enactment of a budget or other proper appropriation." (*White v. Davis I, supra,* 108 Cal.App.4th 197, 226.)

(ii) *Scope of the FLSA*

The Court of Appeal then turned to the question whether the type of employment relationship that it just had described—that is, an employment

relationship in which an employee's entitlement to compensation for work done during a budget impasse is subject to a condition precedent—falls within the scope of the FLSA. Although that court indicated it had found "little case authority addressing the extent to which the FLSA applies to employer-employee relationships subject to such a condition precedent" (*White v. Davis I, supra,* 108 Cal.App.4th 197, 227), the court ultimately concluded that the type of continuing relationship that state employees have with the state during a budget impasse *does* fall within the protection of the FLSA during such an impasse. (*Ibid.*) Reiterating that the FLSA "requires wages to be paid in a timely fashion" (*ibid.*), the Court of Appeal thus concluded that "the FLSA requires the prompt payment of minimum wages and overtime compensation for work performed during a budget impasse, with due reference to the state employee's established work period." (*Id.* at p. 228.)

### (iii) *Compensation over and Above the FLSA Requirements*

The final issue that the Court of Appeal addressed regarding state employee salaries was the question whether state employees are entitled to receive compensation during a budget impasse, beyond that required under the FLSA, by virtue of the contract or due process clauses of the federal and state Constitutions.

As the Court of Appeal recognized, both the state and federal Constitutions contain provisions prohibiting the state from passing any law "impairing the obligation of contracts." (U.S. Const., art. I, § 10; Cal. Const., art. I, § 9.) Although the federal contract clause has been interpreted to be "directed only against impairment by legislation and not by judgment of courts" (*Tidal Oil Co. v. Flanagan* (1924) 263 U.S. 444, 451 [44 S.Ct. 197, 199, 68 L.Ed. 382]), the Court of Appeal noted that the state contract clause has been construed also to apply to judicial action. (*Bradley v. Superior Court* (1957) 48 Cal.2d 509, 519 [310 P.2d 634].) Because the state employee interveners in this case contended that *a judicial order*—the trial court's preliminary injunction—constituted an impermissible impairment of contract in prohibiting the Controller from authorizing the full and regular payment of salaries to which the employees contended they were contractually entitled, the appellate court limited its consideration to the state contract clause.

In addressing the employees' contract clause claim, the Court of Appeal began by explaining that "[u]nder the state contract clause, '[n]either the court nor the Legislature may impair the obligation of a *valid* contract . . . .' [Citation.] However, the contract clause does not protect contracts that are prohibited by law or against public policy. [Citations.]" (*White v. Davis I, supra,* 108 Cal.App.4th 197, 229, italics added by *White v. Davis I.*)

The Court of Appeal then stated that "[g]enerally, 'no contractual obligation may be enforced against a public agency unless it appears the agency was authorized by the Constitution or statute to incur the obligation; a contract entered into by a governmental entity without the requisite constitutional or statutory authority is void and unenforceable.' " (*White v. Davis I, supra,* 108 Cal.App.4th 197, 229.)

The Court of Appeal concluded: "In our view, the state Constitution precludes the state from incurring an obligation to pay employee salaries during a budget impasse in the absence of a proper appropriation, and thus the failure to pay full salaries under such circumstances does not constitute an impairment of contract under the state contract clause." (*White v. Davis I, supra,* 108 Cal.App.4th 197, 229.) The Court of Appeal reasoned that a contractual obligation to pay salaries in the absence of an appropriation "would directly undermine the appropriation requirement in article XVI, section 7 of the state Constitution. As our Supreme Court explained in *Humbert v. Dunn* (1890) 84 Cal. 57, 59 [24 P. 111], this requirement, which is taken from the United States Constitution, 'had its origin in Parliament in the seventeenth century, when the people of Great Britain, to provide against the abuse by the king and his officers of the discretionary money power with which they were vested, demanded that the public funds should not be drawn from the treasury except in accordance with express appropriations therefor made by Parliament [citation]; and the system worked so well in correcting the abuses complained of, our forefathers adopted it, and the restraint imposed by it has become a part of the fundamental law of nearly every state in the Union.' In view of the fundamental nature of this requirement, we conclude that the state cannot undertake obligations protected by the contract clause that directly contravene it. To hold otherwise would gut the requirement." (*White v. Davis I, supra,* 108 Cal.App.4th at pp. 197, 230.)

The Court of Appeal, in similarly denying the employees' claim that the preliminary injunction violated the due process clause insofar as it denied them the payment of their full salaries during a budget impasse, reasoned that "[u]nder principles of contract interpretation, ' " " 'all applicable laws in existence when an agreement is made, which laws the parties are presumed to know and to have in mind, necessarily enter into the contract and form a part of it . . . .' " ' " " "For this reason, state employees must be deemed to have notice of the limitation on the payment of their salaries during a budget impasse." (*White v. Davis I, supra,* 108 Cal.App.4th 197, 230-231.)

(iv) *Conclusion on State Employee Salary Issue*

In view of the foregoing conclusions, the Court of Appeal ultimately held that "the preliminary injunction must be reversed to the extent that it denies

state employees the compensation required under the FLSA during a budget impasse . . . ." (*White v. Davis I, supra,* 108 Cal.App.4th 197, 231.)

### (b) *Other Federal Law*

In addition to the FLSA, the Controller contended in the Court of Appeal that a number of other federal laws require the disbursement of public funds during a budget impasse. The Controller asserted that such payments are required pursuant to the state's participation in the federal (1) food stamp program (7 U.S.C. § 2011 et seq.), (2) foster care and adoption programs (42 U.S.C. §§ 670-679b), (3) child support programs (42 U.S.C. §§ 651-669b), and (4) child welfare services program (42 U.S.C. §§ 620-628).

In analyzing this contention, the Court of Appeal stated that it found guidance in two federal decisions, *Pratt v. Wilson* (E.D.Cal. 1991) 770 F.Supp. 539 and *Dowling v. Davis* (9th Cir. 1994) 19 F.3d 445. In *Pratt*, the plaintiffs brought a federal action challenging the Controller's cessation, during the 1990 budget impasse, of payments that were partially funded under the former federal Aid to Families with Dependent Children (AFDC) program. The court in *Pratt* held that under the supremacy clause the state was required to make AFDC payments during the budget impasse notwithstanding the appropriation requirements of the state Constitution, reasoning that once a state had elected to participate in the AFDC program it was required to comply with the governing federal statutes and regulations mandating timely payments.

In *Dowling v. Davis, supra,* 19 F.3d 445, the plaintiffs brought a somewhat similar federal action challenging the Controller's delay, also during the 1990 budget impasse, of payments under the Medi-Cal program (Welf. & Inst. Code § 14000 et seq.) (partially funded through the federal Medicaid law (42 U.S.C. § 1396)) and under the In-Home Support Service program (Welf. & Inst. Code, § 12300) (partially funded by a federal block grant). In *Dowling*, unlike *Pratt*, the court held that the delay in payments did not violate federal law, concluding that "[d]elayed payment is an inherent feature of the Medicaid statutory and regulatory framework," that the federal block grant supporting the In-Home Support Service program did not require timely payments, and that the state statute governing the In-Home Support Service program predicated the continuing existence of the program on an appropriation in the state budget act. (19 F.3d at pp. 447-448.)

The Court of Appeal held that "[i]n view of *Pratt* and *Dowling*, the key issue is whether the federal laws cited by the Controller require timely payments during a budget impasse." (*White v. Davis I, supra,* 108 Cal.App.4th 197, 232.)

The Court of Appeal then carefully reviewed the controlling statutory provisions and regulations governing each of the federal programs identified by the Controller to determine whether federal law mandates timely payment. With regard to the food stamp program, the foster care and adoption programs, and the child support program, the Court of Appeal concluded that the relevant statutes and regulations require the prompt payment of benefits and prompt provision of services specified by those programs, and thus that the Controller properly may disburse funds during a budget impasse to comply with such federal mandates. (*White v. Davis I, supra,* 108 Cal.App.4th 197, 233.) With regard to the child welfare services program, however, the Court of Appeal concluded that the applicable federal regulations mandated the timely disbursement only of those funds necessary to comply with certain notice and hearing requirements imposed by the federal regulations on the child welfare services program, and it held that only such funds may be properly disbursed by the Controller during a budget impasse. (*Id.,* at pp. 1005-1006.)

### 4. *Adequacy of Injunction Bond*

After addressing the validity of the various grounds upon which the Controller maintained that payments properly could be made during a budget impasse, the Court of Appeal took note of the Controller's and state employee interveners' additional contention that the trial court had failed to require plaintiffs to post an adequate injunction bond. As noted above, in granting the preliminary injunction the trial court ordered plaintiffs to post a $100,000 bond.

As the Court of Appeal recognized, Code of Civil Procedure section 529, subdivision (a), provides generally that "[o]n granting an injunction, the court or judge must require an undertaking on the part of the applicant to the effect that the applicant will pay to the party enjoined any damages, not exceeding an amount to be specified, the party may sustain by reason of the injunction, if the court finally decides that the applicant was not entitled to the injunction." As past cases have explained, "the trial court's function is to estimate the harmful effect which the injunction is likely to have on the restrained party and to set the undertaking at that sum." (*ABBA Rubber Co. v. Seaquist* (1991) 235 Cal.App.3d 1, 14 [286 Cal.Rptr. 518].)

The Court of Appeal determined, however, that it was unnecessary for it to address the claimed inadequacy of the injunction bond in view of (1) its conclusion that the preliminary injunction must be set aside in part, and (2) plaintiffs' representation that they were not seeking further relief from the trial court. (*White v. Davis I, supra,* 108 Cal.App.4th 197, 235.)

## 5. *Disposition by the Court of Appeal*

In its disposition, the Court of Appeal dismissed the appeal in the 1997 action as moot. With regard to the 1998 action, the court stated: "The preliminary injunction . . . is reversed to the extent that it bars the Controller from disbursing funds pursuant to (1) continuing appropriations, (2) article III, section 4, and article XVI, section 8.5 of the state Constitution, (3) the [f]ederal [Fair] Labor Standards Act (29 U.S.C. § 201 et seq.), and (4) the federal funding mandates that we have identified applicable to the food stamp program (7 U.S.C. § 2011 et seq.), foster care and adoption programs (42 U.S.C. § 670 et seq.), child support program (42 U.S.C. §§ 651-669b), and Child Welfare Services program (42 U.S.C. §§ 620-628). The preliminary injunction is otherwise affirmed. In view of [plaintiffs'] abandonment of further action in the trial court, we do not remand the matter for modification of the preliminary injunction. . . ." (*White v. Davis I,* *supra,* 108 Cal.App.4th 197, 235.)

II

As noted above, only the Controller and several state employee interveners sought review from the Court of Appeal's decision,[8] and the petitions for review challenged only two aspects of that decision. The Controller's principal objection is to the Court of Appeal's treatment of the preliminary injunction issue: the Controller maintains that under the general principles governing the issuance or denial of a preliminary injunction, the trial court in the 1998 case should not have granted a preliminary injunction in any respect, and that the Court of Appeal consequently erred in upholding the preliminary injunction in part. The state employee interveners principally challenge the Court of Appeal's conclusions with regard to the payment of state employee salaries during a budget impasse, contending that the Court of Appeal should have held that the Controller is authorized to pay all state employees their full and regular salaries during a budget impasse. No party has challenged any other aspect of the Court of Appeal's decision and none of the numerous additional issues passed upon by the Court of Appeal has been briefed or argued in this court, and thus we have no occasion to address any of those additional issues here.[9] Moreover, as noted above, the Court of Appeal itself confined its discussion only to the particular provisions of law

---

[8]A petition for review was filed by the California State Employees Association (CSEA), and a separate petition for review jointly was filed by the California Correctional Peace Officers Association (CCPOA) and the California Correctional Union of Safety Employees (CAUSE).

[9]As we explain more fully below, however, because the other issues discussed by the Court of Appeal are important in their own right, we shall order the Court of Appeal opinion in this matter to be published in the Official Reports. (See, *post,* p. 563, fn. 14.)

that were raised by the parties on appeal, and did not purport to determine whether any other provision of law may authorize or mandate the disbursement of funds during a budget impasse.[10]

Accordingly, we shall address only the two general issues presented on review: (1) Did the trial court err in granting a preliminary injunction in this case?, and (2) Is the Controller authorized to pay all state employees their full and regular salaries during a budget impasse? We turn first to the preliminary injunction issue.[11]

## III

The Controller's principal contention before this court is that the Court of Appeal erred in upholding the preliminary injunction in any respect. The Controller argues that the trial court's issuance of a preliminary injunction was contrary to well-established principles governing the circumstances in which a trial court in a taxpayer action may enjoin a public official from

---

[10]An amicus curiae brief has been filed in this court by the California Appellate Defense Counsel (CADC), asserting that under the supremacy clause of the federal Constitution (U.S. Const., art. VI, § 2) attorneys who are appointed to represent indigent defendants in criminal prosecutions are entitled to obtain payment for their services during a budget impasse because the state is obligated by the Sixth and Fourteenth Amendments of the federal Constitution to provide such representation. Unlike the state employee interveners, however, CADC did not seek to intervene in this proceeding in the trial court, and the contention raised in its brief was not addressed by either the trial court or the Court of Appeal. Under these circumstances, we conclude that it is not appropriate to address the issue in this proceeding, and we express no view on the merits of this assertion.

For similar reasons, we do not address the claims raised in a separate amicus curiae brief challenging the validity of the state's failure during a budget impasse to make payments to those persons or entities that furnish goods or services to or on behalf of the state.

[11]Two requests for judicial notice have been filed in this case. No objection to either request has been received.

The Controller requests that we take judicial notice of (1) the date that the budget act for the 1998-1999 fiscal year (Stats. 1998, ch. 324) was enacted, (2) the effective dates of the emergency appropriation enacted after the issuance of the trial court's preliminary injunction (Stats. 1998, ch. 213, § 1, enacting Sen. Bill No. 267 (1997-1998 Reg. Sess.)), and (3) the legislative history of Senate Bill No. 267. All of these items are proper subjects of judicial notice (Evid. Code, § 452, subd. (c) [official acts of the legislative branch of the State of California]), and accordingly the request to take judicial notice is granted.

CAUSE and CCPOA, two of the state employee interveners, request the court to take judicial notice of (1) the current salary ranges for certain state public safety employees as set forth in the salary schedule in the current agreement between CAUSE and the state, and (2) the current salary ranges for state correctional workers as set forth in the Department of Personnel Administration's California Civil Service Pay Scales. Although the relevance of this material is debatable, the material appears to be properly subject to judicial notice under Evidence Code section 452, subdivisions (c) (official acts of the executive branch of the State of California) and (h) (facts that are not reasonably subject to dispute and are capable of immediate and accurate determination by resort to sources of reasonably indisputable accuracy). Accordingly, the request to take judicial notice of this material is granted.

expending funds prior to a full adjudication of the merits of the taxpayer's claim. As we explain, we agree that the trial court erred in granting the preliminary injunction.

█ As its name suggests, a *preliminary* injunction is an order that is sought by a plaintiff *prior to a full adjudication of the merits of its claim.* (See 6 Witkin, Cal. Procedure (4th ed. 1997) Provisional Remedies, § 287, p. 228.) To obtain a preliminary injunction, a plaintiff ordinarily is required to present evidence of the irreparable injury or interim harm that it will suffer if an injunction is not issued pending an adjudication of the merits. (See *City of Torrance v. Transitional Living Centers for Los Angeles, Inc.* (1982) 30 Cal.3d 516, 526 [179 Cal.Rptr. 907, 638 P.2d 1304].)

Past California decisions further establish that, as a general matter, the question whether a preliminary injunction should be granted involves two interrelated factors: (1) the likelihood that the plaintiff will prevail on the merits, and (2) the relative balance of harms that is likely to result from the granting or denial of interim injunctive relief. As explained in *IT Corp. v. County of Imperial* (1983) 35 Cal.3d 63, 69-70 [196 Cal.Rptr. 715, 672 P.2d 121]: "This court has traditionally held that trial courts should evaluate two interrelated factors when deciding whether or not to issue a preliminary injunction. The first is the likelihood that the plaintiff will prevail on the merits at trial. The second is the interim harm that the plaintiff is likely to sustain if the injunction were denied compared to the harm that the defend- ant is likely to suffer if the preliminary injunction were issued." As the court in *IT Corp.* further noted: "*The ultimate goal* of any test to be used in deciding whether a preliminary injunction should issue *is to minimize the harm which an erroneous interim decision may cause.* [Citation.]" (*Id.* at p. 73, italics added.)

█ A number of Court of Appeal decisions have addressed the proper application of these general principles relating to preliminary injunctions in the particular circumstance of *a taxpayer action* that is brought to enjoin *the alleged improper expenditure of public funds.* In Cohen v. Board of Supervisors (1986) 178 Cal.App.3d 447 [225 Cal.Rptr. 114] (*Cohen II*), the Court of Appeal, in a decision on remand from this court (see *Cohen v. Board of Supervisors* (1985) 40 Cal.3d 277 [219 Cal.Rptr. 467, 707 P.2d 840]) addressed the question whether the relative "balance of harms" in that case supported the trial court's decision denying a preliminary injunction in a taxpayer action that challenged the validity of a recently enacted city ordinance imposing various regulations and restrictions on escort services within the city. The action challenged the ordinance on a variety of grounds, including a claim that it was facially unconstitutional under the First Amendment. Noting that one of the plaintiffs in the case had brought suit solely as

a resident taxpayer under section 526a of the Code of Civil Procedure to enjoin the alleged illegal expenditure of public funds, the court in *Cohen II* observed that this plaintiff's "interest appears to be limited to his taxpayer's pocketbook, an interest which is sufficient to confer statutory standing to maintain this action and bring it to final judgment permanently enjoining unlawful expenditures (*Blair v. Pitchess* (1971) 5 Cal.3d 258, 267-270 [96 Cal.Rptr. 42, 486 P.2d 1242, 45 A.L.R.3d 1206]), but which to our knowledge *has never been held to substitute for the high degree of existing or threatened injury required for the prejudgment injunctive relief sought here.*" (178 Cal.App.3d at p. 454, italics added.) The court in *Cohen II* went on to expressly reject the plaintiff taxpayer's argument that its assertion that the ordinance was unconstitutional, and that the public funds that would be expended to enforce the ordinance would therefore be unlawfully incurred, was itself sufficient to demonstrate the type of irreparable injury that would justify granting a preliminary injunction. (*Id.* at pp. 454-455.) Accordingly, on this ground alone, the court in *Cohen II* affirmed the trial court's order in that case denying the taxpayer's request for a preliminary injunction.

In *Loder v. City of Glendale* (1989) 216 Cal.App.3d 777 [265 Cal.Rptr. 66] (*Loder I*), the Court of Appeal considered the question of interim harm in reviewing the validity of a trial court order *granting* a preliminary injunction in a taxpayer action challenging the validity of a recently adopted city drug testing program as violative of federal and state constitutional restrictions on unreasonable searches and seizures. Following the reasoning of the decision in *Cohen II*, the Court of Appeal in *Loder I* held that the plaintiff's "status as a taxpayer by itself is insufficient to entitle her to a preliminary injunction. . . . [¶] . . . [¶] [W]hile plaintiff's alleged status as a taxpayer affords her standing to maintain this action, her harm for preliminary injunction purposes is limited to defendants' alleged improper use of tax funds. This monetary harm is insufficient to justify the issuance of a preliminary injunction." (216 Cal.App.3d at pp. 784-785.) On this basis, the court in *Loder I* reversed the trial court's order granting a preliminary injunction, taking care at the same time to note that "[n]othing in this opinion is intended to reflect on, or express any opinion as to the validity of the City's drug testing program or any part of it." (*Id.* at p. 786.)[12]

In *Leach v. City of San Marcos* (1989) 213 Cal.App.3d 648 [261 Cal.Rptr. 805] (*Leach*), the Court of Appeal reached the same conclusion as the courts

---

[12]After a trial on the merits, the trial court in the *Loder* case granted a permanent injunction enjoining the application of the Glendale drug testing program to some employment positions, and on appeal of that judgment this court in *Loder v. City of Glendale* (1997) 14 Cal.4th 846 [59 Cal.Rptr.2d 696, 927 P.2d 1200] addressed the validity of the program.

in *Cohen II* and *Loder I* with regard to the general principle that a taxpayer's claim of an illegal expenditure of public funds ordinarily is not sufficient in itself to warrant the issuance of a preliminary injunction. In *Leach*, a taxpayer challenged the validity of a redevelopment plan adopted by the defendant city, and sought a preliminary injunction to prevent the city from taking any further action to implement the challenged plan. Although the taxpayer presented evidence to support his claim that the redevelopment plan at issue might well not conform with the applicable Community Redevelopment Law, he presented no specific evidence indicating that an injunction was necessary to prevent irreparable harm pending a trial on the merits of the claim, and the trial court denied the preliminary injunction. On appeal, the Court of Appeal affirmed the denial of a preliminary injunction, concluding that even though the taxpayer had demonstrated a likelihood of success on the merits, the trial court properly had denied a preliminary injunction on the ground that the taxpayer had failed to demonstrate sufficient interim harm. The court in *Leach* stated that "even if the record here demonstrated the imminent expenditure of tax increment revenues, such an expenditure would not support a preliminary injunction in favor of a private citizen." (213 Cal.App.3d at p. 662.) After quoting at length the pertinent portions of *Cohen II*, the court in *Leach* observed that, "[c]ontrary to Leach's argument, we find no meaningful distinction between his status as a taxpayer whose burden might be increased by the plan and the plaintiff in *Cohen II* whose tax dollars might have been unlawfully spent enforcing the escort ordinance. While the redevelopment plan may eventually impose a larger burden on taxpayers outside the plan area than enforcement of an escort ordinance, Leach has not suggested how much of a burden he would suffer, and most importantly, how that burden would affect him. Given these circumstances, his status as a taxpayer will not support a preliminary injunction." (*Id.* at p. 663.) Accordingly, the court affirmed the trial court order denying a preliminary injunction.

In the present proceeding, plaintiffs brought their 1998 action solely in their capacity as taxpayers and relied upon their interest as taxpayers in claiming that they would be irreparably harmed by the alleged impropriety of the payments of public funds that the Controller proposed to authorize during the budget impasse. Plaintiffs suggested that such payments not only violated the state Constitution, but also eliminated significant public pressure that (in the absence of such payments) would be brought to bear upon the Legislature to comply with its constitutional obligation to timely enact a budget bill. Under the Court of Appeal decisions discussed above, a taxpayer's general interest in not having public funds spent unlawfully (including not having such funds spent in alleged contravention of fundamental constitutional restrictions), while sufficient to afford standing to bring a taxpayer

action under Code of Civil Procedure section 526a and to obtain a permanent injunction after a full adjudication on the merits, ordinarily does not in itself constitute the type of irreparable harm that warrants the granting of preliminary injunctive relief. Under these appellate decisions, the granting of a preliminary injunction in the present case arguably would be improper on this ground alone.

In this case, however, we need not decide whether interim harm to a taxpayer's interest is *ever* in itself sufficient to justify a preliminary injunction barring the expenditure of public funds during a budget impasse, because even if there may be some circumstances in which granting a preliminary injunction might be warranted in a taxpayer action (for example, if the Controller continues to approve expenditures that have been held unlawful by a controlling judicial precedent), in the case before us we believe it is clear that in light of both the relative balance of harms and the lack of clear authority supporting the merits of plaintiffs' broad claim, the trial court abused its discretion in granting a preliminary injunction.

In support of their claim of irreparable injury if a preliminary injunction were not issued, plaintiffs alleged that "[t]he failure to grant the injunction will allow the flagrant violation of the Constitution to continue as it has for the past dozen years causing extreme hardship and sometimes bankruptcy to the numerous small businesses and other suppliers of goods and services to the State who have not been paid due to the failure of the Legislature to timely pass and the Governor to timely approve a State Budget, while illegally paying themselves. [¶] The respect for the Constitution has and will be destroyed by this illegal activity. If the Legislature and the Governor wish to continue their illegal activity, the correct method is to seek an Amendment to the Constitution to legalize such activity."

In advancing this claim of irreparable injury, however, plaintiffs failed to cite any authority to support the contention that a taxpayer's interest in forestalling an alleged continuing violation of the state Constitution constitutes the type of irreparable injury that will support granting a preliminary injunction, and, as we have seen, the Court of Appeal decisions cited above have rejected just such a contention.

Further, as part of their claim of irreparable harm, plaintiffs referred to the hardship sustained by small businesses and other suppliers of goods and services to the state that are not paid during a budget impasse. Although plaintiffs did not expressly explain how the granting of a preliminary injunction prohibiting the Controller from making any payments to state employees or other persons would relieve the hardship suffered by such

small businesses and other vendors during a budget impasse, plaintiffs' contention apparently was based upon the strategic assumption that the trial court's granting of a preliminary injunction prohibiting the Controller from making any payments during a budget impasse would place pressure on the Legislature to enact a budget bill promptly, and in that indirect manner might result in relieving the hardship suffered by small businesses or other vendors during the budget impasse. Even if we assume that plaintiffs, in their capacity as taxpayers, have standing to rely upon the interim harm that would be sustained by such businesses or other vendors, the suggestion that a trial court may issue a preliminary injunction broadly prohibiting the Controller from authorizing the expenditure of public funds for the purpose of placing pressure on the Legislature to pass a budget in a timely fashion is problematical. The relevant provision of the California Constitution that requires passage of the budget bill "by midnight on June 15" (Cal. Const., art. IV, § 12) does not purport to authorize a preliminary injunction against the Controller as a "sanction" or "lever" against the Legislature for failing to enact a budget on time, and thus any legal action seeking an injunction against the Controller's expenditure of funds during a budget impasse necessarily must rest on the asserted illegality of a particular challenged expenditure or expenditures rather than on the conduct of the Legislature. Indeed, in light of the separation of powers doctrine (Cal. Const., art. III, § 3), courts must be especially sensitive about intruding upon the Legislature's fundamental—and essentially political—legislative and budget powers, and must be vigilant not to depart from established principles governing preliminary injunctions simply in order to lend support to an effort to increase the leverage on the Legislature to pass a budget bill.

Thus, the principal properly cognizable harm alleged by plaintiffs that would be prevented by the granting of a preliminary injunction would be the indirect fiscal harm they as taxpayers would suffer by the Controller's payment of those public funds that the Controller concluded properly could be made during the budget impasse, but that plaintiffs contended were not properly authorized by the Constitution.

In its opposition to the request for a preliminary injunction, the Controller cited and relied upon the numerous Court of Appeal opinions, described above, holding that a taxpayer's claim that public funds may be improperly expended does not itself constitute sufficient harm to support the issuance of a preliminary injunction. The Controller further pointed out that when the budget act for the then current fiscal year was enacted, that act, like prior budget acts, would be retroactive to the beginning of the fiscal year (Gov.

Code, §§ 1231.1, 1231.2),[13] and thus even if the trial court were to assume, as plaintiffs contended, that some or all of the expenditures that the Controller proposed to authorize during the budget impasse could not lawfully be paid *at that time*, the asserted loss to the treasury in any event would be temporary, because the subsequently enacted budget act ultimately would provide the necessary appropriation for such expenditures. The Controller argued that under these circumstances plaintiffs certainly had not demonstrated the type of irreparable harm that would support a preliminary injunction.

Moreover, in contrast to the lack of irreparable harm that assertedly would result from the denial of a preliminary injunction, the opposition papers filed by both the Controller and the state employee interveners strongly emphasized the serious and widespread hardship that would be imposed by the granting of the preliminary injunction sought by plaintiffs. As our summary of the Court of Appeal's decision in this case makes clear, the public funds at issue in this case affect the availability of the essential necessities of life for tens of thousands of Californians. The opposition papers pointed out that granting the broad preliminary injunction sought by plaintiffs—precluding the Controller from making any payments authorized by continuing appropriations or from paying any wages to state employees for work done after the preliminary injunction was granted or making other payments required by federal law—would deprive current state employees, persons receiving state pensions or disability benefits, persons receiving food stamps, persons caring for adopted children with special needs, and thousands of others, of funds necessary to feed, house, and clothe themselves and their families for the duration of the budget impasse. The Controller also noted that granting a preliminary injunction would prevent the state from making payments to bondholders—thereby exposing the state to potentially costly litigation and damage claims—and would deny local governmental entities access to the funds such entities had invested in the Local Agency Investment Fund, a special fund in the state treasury that was created for the purpose of providing a safe and reliable investment option to local governments. (See Gov. Code, § 16429.1.) Finally, the Controller observed that if the injunction

---

[13]As noted above, Government Code section 1231.1 provides: "Funds from each appropriation made in the budget act for any fiscal year may be expended to pay officers and employees whatever salary that would have otherwise been received had the budget act been adopted on or prior to July 1, of that fiscal year."

Government Code section 1231.2 provides: "Funds from each appropriation made in the budget act for any fiscal year may be expended to pay any obligation incurred between the commencement of that fiscal year and the effective date of the budget act for that fiscal year, which would otherwise have been authorized by the budget act of that year had that act been adopted, on or prior to July 1 of that year, subject to the same limitations, conditions, and requirements."

were to result in the scenario that plaintiffs asserted was required—the closure of state government—the injunction would have a "dire effect on numerous important state services involving safety, health and education, and thus could dramatically impact the public at large."

In granting a preliminary injunction, the trial court did not provide any indication that it had considered or weighed the hardship that would be imposed by granting such an injunction against the hardship that would result from denying an injunction. Instead, the order granting the preliminary injunction rested simply on the trial court's agreement with the merits of plaintiffs' constitutional claim. The order stated that, in the court's view, article IV, section 12, subdivision (c) of the California Constitution prohibits the Controller from authorizing *any* payments prior to the enactment of a budget bill (other than pursuant to the exceptions embodied in article IV, section 12). The order further concluded that "so-called 'continuing appropriations' have no constitutional base" and expressed the view that the holding in *Biggs v. Wilson, supra,* 1 F.3d 1537, requiring the state to pay the wages required by the FLSA during a budget impasse, did not apply to the present situation, because "if the state employees choose to continue to work with knowledge of no authority to appropriate money to pay them, there can be no violation of the FLSA. The employees would simply be volunteers."

In granting a preliminary injunction without considering the relative harms that would be imposed by denying or granting a preliminary injunction, the trial court erred. As discussed above, the controlling authorities make it clear that in evaluating a request for a preliminary injunction a court must consider two factors—both the likelihood of success on the merits, and the relative harms that would flow from denying or granting a preliminary injunction.

Although the Controller and state employee interveners argued in the Court of Appeal that the preliminary injunction should be set aside in its entirety because of the trial court's failure to consider the balance of hardships, and because the hardship resulting from granting a preliminary injunction dramatically outweighed any hardship that the plaintiff-taxpayers would incur if a preliminary injunction were denied, the Court of Appeal declined to set aside the preliminary injunction in its entirety and held instead that the injunction granted in this case properly could be upheld in part even if the balance of harms did not favor plaintiffs—based upon " 'a sufficiently strong showing of likelihood of success on the merits . . . .' (*Common Cause v. Board of Supervisors* (1989) 49 Cal.3d [432,] 447 [261 Cal.Rptr. 574, 777 P.2d 610].)" (*White v. Davis I, supra,* 108 Cal.App.4th 197, 231.)

We agree with the Controller that the decision in *Common Cause v. Board of Supervisors, supra,* 49 Cal.3d 432, provides no basis for upholding the preliminary injunction issued by the trial court in the present case. The relevant passage in *Common Cause* upon which the Court of Appeal relied reads in full: "The likelihood of success on the merits and the balance-of-harms analysis are ordinarily 'interrelated' factors in the decision whether to issue a preliminary injunction. [Citations.] The presence or absence of each factor is usually a matter of degree, and if the party seeking the injunction can make a sufficiently strong showing of likelihood of success on the merits, the trial court has discretion to issue the injunction notwithstanding that party's inability to show that the balance of harms tips in his favor." (49 Cal.3d at pp. 446-447.)

As the Controller observes, although this passage indicates that in some instances a trial court may grant a preliminary injunction upon a sufficiently strong showing of likelihood of success even when the party seeking the injunction cannot show that the balance of harms "tips" in its favor (*Common Cause v. Board of Supervisors, supra,* 49 Cal.3d at p. 477), the decision in *Common Cause* did *not* suggest that when a party makes a sufficient showing of likely success on the merits a trial court need not consider the relative balance of hardships *at all,* or that when the balance of hardships dramatically favors the denial of a preliminary injunction a trial court nonetheless may grant a preliminary injunction on the basis of the likelihood-of-success factor alone. As noted, a principal objective of a preliminary injunction "is to minimize the harm which an *erroneous* interim decision may cause" (*IT Corp. v. County of Imperial, supra,* 35 Cal.3d 63, 73, italics added), and thus a court faced with the question whether to grant a preliminary injunction cannot ignore the possibility that its initial assessment of the merits, prior to a full adjudication, may turn out to be in error.

In this case, the balance of harms dramatically favored denial of the preliminary injunction. The principal legitimate interest of plaintiffs that allegedly would be harmed by denying a preliminary injunction was their general interest as taxpayers in not having public funds disbursed unlawfully, an interest that the appellate court decisions discussed above found insufficient in itself to warrant the granting of a preliminary injunction. On the other hand, granting the preliminary injunction would cause great immediate harm to the many persons who would be deprived of vital funds, frequently necessary to obtain the necessities of life, and would threaten the continued delivery of a wide range of essential public services.

Furthermore, even if the relative hardships posed by granting or denying a preliminary injunction were more evenly balanced, the trial court's preliminary injunction in this case could not be upheld on the theory that plaintiffs

had made a sufficiently strong showing of likelihood of success on the merits. As noted above, in the trial court plaintiffs advanced the very broad position that, under the California Constitution, if the Legislature fails to pass a budget bill on time, "state government must shut down" in the absence of an emergency appropriation. Plaintiffs, however, failed to cite any case authority to support their reading of the state Constitution, and, as the Court of Appeal's opinion in this case demonstrates, such a reading of the relevant constitutional provisions is untenable and contrary to established precedent. Under California law, the Controller and other public officials in the executive branch have been given the initial and primary responsibility for ascertaining the payments that lawfully may be made from the treasury during a budget impasse. These officials, of course, have the obligation to follow the law and must comply with controlling judicial decisions that have determined whether a particular category of payments properly may be made during a budget impasse. As explained by the Court of Appeal's decision, however, there are numerous grounds on which the Controller properly may authorize the payment of funds from the treasury even when a budget bill has not yet been enacted, and the question whether a particular payment or category of payments validly may be made often involves complex legal issues. Plaintiffs' broad legal argument that the Constitution bars virtually all such payments clearly was not so unquestionably meritorious as to obviate any need to consider the balance of relative harms. Accordingly, the trial court's action in granting a preliminary injunction cannot be defended on the ground that plaintiffs had made a sufficiently strong showing of their likelihood of success on the merits.

In sum, we conclude that the trial court abused its discretion in issuing a preliminary injunction in the 1998 action, and that the judgment of the Court of Appeal must be reversed insofar as it affirms in any respect the granting of a preliminary injunction.

## IV

As discussed, the complaint filed by plaintiffs advanced the very broad position that, in the absence of enactment of a budget bill or an emergency appropriation, "the state government must close." The complaint did not challenge on a point-by-point basis the validity of specific categories or types of payments authorized by the Controller during a budget impasse. In responding to plaintiffs' request for a preliminary injunction, the Controller cited a number of categories of payments that assertedly could be made during a budget impasse, in support of the Controller's position that a preliminary injunction should not be granted. In granting the preliminary injunction, the trial court largely rejected the claim that payments during a

budget impasse could be authorized on the various grounds relied upon by the Controller.

On appeal, the Court of Appeal, after finding that the question of what payments the Controller is authorized to make during a budget impasse constitutes an issue of great importance but one that often will evade timely appellate review, undertook to address the merits of the Controller's claims that payment of public funds during a budget impasse properly may be made when payment is authorized by (1) a continuing appropriation, (2) a self-executing state constitutional mandate, or (3) a federal mandate, and, within these categories, by particular constitutional or statutory provisions.

Although the petitions for review filed in this court contended that the trial court erred in granting a preliminary injunction in any respect and maintained that the injunction should be set aside in its entirety, the petitions did not question the Court of Appeal's decision to address the substantive merits of the issue whether disbursement of public funds may be authorized during a budget impasse on the various grounds advanced by the Controller. Instead, the petitions for review challenged the Court of Appeal's conclusion with respect to one of the categories of payments—the payment of salaries for state employees during a budget impasse.

In light of our conclusion in part III of this opinion that the preliminary injunction that was issued in this case must be set aside in its entirety because the trial court failed to apply the applicable standards properly in granting the injunction, it would be possible to dispose of this matter on that ground alone without reaching the merits of the substantive payment-of-salary issue raised by the petitions. As the Court of Appeal recognized, however, the question of what payments the Controller is authorized to make during a budget impasse is the type of issue that arises frequently but often may evade timely appellate review. Under the circumstances, we conclude it is appropriate to address the state employee salary issue that has been briefed in this court, in order to provide guidance to the Controller and other public officials in the event of a future budget impasse. Because the salary issue is the only substantive matter upon which review was sought and granted, we confine our substantive discussion to that category of payments.[14]

 The state employee interveners maintain that all state employees are entitled to timely payment, on their regular payday, of their full and regular

---

[14]Under the current California Rules of Court, a Court of Appeal opinion that is superseded by a grant of review ordinarily is not published in the Official Reports, but this court has authority after granting review, or after decision, to order the opinion of the Court of Appeal published in whole or in part. (Cal. Rules of Court, rule 976(d).) In *Agricultural Labor Relations Bd. v. Tex-Cal Land Management, Inc.* (1987) 43 Cal.3d 696, 709, footnote 12 [238 Cal.Rptr. 780, 739 P.2d 140], we explained that the efficient use of this court's review

salaries for work performed during a budget impasse, notwithstanding the absence of a duly enacted budget bill. They assert that payment of full state employee salaries during a budget impasse is required under both state and federal law. We begin with a discussion of California law.

## A. *California Law*

### 1. *State Constitutional Impairment-of-contract Clause*

CSEA argues that under the provision of the California Constitution barring the impairment of contracts (Cal. Const., art. I, § 9), the state is constitutionally required during a budget impasse to pay state employees, on their regular payday, their regular and full salaries for work performed during that period. CSEA relies upon a line of California decisions holding that, in California, public employment gives rise to certain obligations, protected by the contract clause of the Constitution, including "the right to the payment of salary which has been earned." (*Kern v. City of Long Beach* (1947) 29 Cal.2d 848, 853 [179 P.2d 799]; see also *Olson v. Cory* (1980) 27 Cal.3d 532, 538 [178 Cal.Rptr. 568, 636 P.2d 532].) CSEA argues that the Controller is authorized to pay a state employee's salary on his or her regular payday even in the absence of a duly enacted and available appropriation, because the failure to pay an employee's salary at such time would amount to an unconstitutional impairment of contract.

As CSEA acknowledges, it is well established that the terms and conditions of public employment, unlike those of private employment, generally are established by statute or other comparable enactment (e.g., charter provision or ordinance) rather than by contract. (See, e.g., *Boren v. State Personnel Board* (1951) 37 Cal.2d 634, 641 [234 P.2d 981].) Nonetheless, a

---

jurisdiction—in which we may grant or limit review to only some of the issues addressed in the Court of Appeal decision—"suggests that . . . significant Court of Appeal opinions should be available as citable precedent with respect to issues not reached by us on subsequent review." In *Tex-Cal*, upon finding that the Court of Appeal opinion in that case was "worthy of publication in that regard" (*ibid.*), we ordered the Court of Appeal opinion to be published in the Official Reports, but at the same time expressly cautioned that "our order of publication does not necessarily imply agreement with the Court of Appeal's analysis on issues not addressed in our opinion." (*Ibid.*)

In this case, as in *Tex-Cal*, we find that the issues that were decided by the Court of Appeal but upon which review was not sought are significant issues, and that the discussion of those issues in the Court of Appeal's opinion is worthy of publication. Accordingly, in order to preserve that court's analysis of those issues as citable Court of Appeal precedent, we shall order the Court of Appeal opinion to be published in the Official Reports. As we have explained above, however, because these additional issues have not been briefed or argued in this court, we express no opinion on the merits of those issues, and we emphasize that the Court of Appeal opinion shall constitute citable authority *not of this court but of the Court of Appeal.*

long line of California cases establishes that with regard to at least certain terms or conditions of employment that are created by statute, an employee who performs services while such a statutory provision is in effect obtains a right, *protected by the contract clause,* to require the public employer to comply with the prescribed condition.

*Kern v. City of Long Beach, supra,* 29 Cal.2d 848, is perhaps the seminal decision in this line of authority. In *Kern,* at the time the plaintiff firefighter had begun his employment with the defendant city, the city charter provided that after 20 years of service a firefighter would be entitled to receive a retirement pension equal to 50 percent of his or her annual salary. A month before the plaintiff in *Kern* completed the required 20 years of service, the city revised the charter and purported to eliminate all pension benefits as to all persons not then eligible for retirement. In *Kern,* the plaintiff challenged the validity of the city's action, and this court concluded that the city "by completely repealing all pension provisions, has attempted to impair its contractual obligations. This it may not constitutionally do, and therefor the repeal is ineffective as to petitioner." (29 Cal.2d at p. 856.) In the course of reaching this determination, the court in *Kern* explained that its conclusion was "not in conflict with language appearing in some cases to the general effect that public employment is not held by contract. [Citations.] These cases involve the right to remain in an office or employment, or to the continuation of civil service status. Although there may be no right to tenure, *public employment gives rise to certain obligations which are protected by the contract clause of the Constitution, including the right to the payment of salary which has been earned.* Since a pension right is 'an integral portion of contemplated compensation' [citation], it cannot be destroyed, once it has vested, without impairing a contractual obligation." (*Id.* at p. 853.)

In *Olson v. Cory, supra,* 27 Cal.3d 532, another case invalidating an attempt retroactively to reduce vested pension rights, the court similarly stated: "We recognize the often quoted language that public employment is not held by contract and therefore is not protected by the contract clause. [Citations.] Those and other cases involve purported rights to remain in office or to continued public employment. On the other hand, we deal here with the right to compensation by persons serving their terms of public office to which they have undisputed rights. '[P]ublic employment gives rise to certain obligations which are protected by the contract clause of the Constitution. . . .' [Citations.] *Promised compensation is one such protected right.* [Citation.] Once vested, the right to compensation cannot be eliminated without constitutionally impairing the contract obligation." (27 Cal.3d at pp. 537-538, italics added.)

Other cases have recognized that the state may violate the impairment-of-contracts clause not only by directly reducing the pension benefits an

employee is entitled to receive, but also by failing to fulfill its obligation—created by statute—to make continuing contributions to its employees' retirement fund so as to preserve the actuarial soundness of the fund. (See, e.g., *California Teachers Assn. v. Cory* (1984) 155 Cal.App.3d 494 [202 Cal.Rptr. 611]; *Valdes v. Cory* (1983) 139 Cal.App.3d 773 [189 Cal.Rptr. 212].)

As CSEA maintains, these past California cases clearly establish that although the conditions of public employment generally are established by statute rather than by the terms of an ordinary contract, once a public employee has accepted employment and performed work for a public employer, the employee obtains certain rights arising from the legislative provisions that establish the terms of the employment relationship—rights that are protected by the contract clause of the state Constitution from elimination or repudiation by the state. As noted, a number of cases have stated broadly that among the rights protected by the contract clause is "the right to the payment of salary which has been earned." (E.g., *Kern v. City of Long Beach, supra,* 29 Cal.2d 848, 853.) None of the cases upon which CSEA relies, however, specifically address the question whether the rights obtained by a public employee under state law include the right *to receive payment of earned salary in the absence of an available appropriation.* To answer that question we must examine the applicable California constitutional provisions and statutes to determine which rights such provisions purport to provide.

A number of constitutional and statutory provisions relate to the question whether a state employee who works during a budget impasse obtains a right, protected by the contract clause, to receive payment for such work prior to the enactment of an available appropriation. We note that unlike past cases that have generally involved impairment-of-contract challenges to *new* or *revised* legislative provisions that purport to alter the compensation or other conditions of employment set forth in earlier legislative measures after an employee already has performed services, in this case there has been no recent change in the relevant constitutional or statutory provisions.

To begin with, as noted above, article XVI, section 7 of the California Constitution provides that "[m]oney may be drawn from the Treasury only through an appropriation made by law and upon a Controller's duly drawn warrant." As the Court of Appeal observed, this constitutional requirement—which has counterparts in the United States Constitution (U.S. Const., art. I, § 9, cl. 7) and in most state constitutions—"had its origin in Parliament in the seventeenth century, when the people of Great Britain, to provide against abuse by the king and his officers of the discretionary money power with

which they were vested, demanded that public funds should not be drawn from the treasury except in accordance with express appropriations therefor made by Parliament [citation]; and the system worked so well in correcting the abuses complained of, our forefathers adopted it, and the restraint imposed by it has become a part of the fundamental law of nearly every state in the Union." (*Humbert v. Dunn, supra,* 84 Cal. 57, 59.)

Consistent with the directive of article XVI, section 7 of the California Constitution, Government Code section 12440 provides: "The Controller shall draw warrants on the Treasurer for the payment of money directed by law to be paid out of the State Treasury; but a warrant shall not be drawn unless authorized by law, and unless, except for refunds authorized by Section 13144, unexhausted specific appropriations provided by law are available to meet it."

With regard to the payment of state employee salaries, Government Code section 9610, enacted in 1943, provides: "The fixing or authorizing the fixing of the salary of a State officer or employee is not intended to and does not constitute an appropriation of money for the payment of the salary. *The salary should be paid only in the event that moneys are made available by another provision of law.*" (Italics added; cf. Cal. Const., art. III, § 4 [dealing with *elected* state officers].) This statute sets forth the basic understanding that statutes or other measures that set salaries for state employees are not themselves appropriations for such salaries, and further makes clear that the payment of a salary to a state employee depends upon the availability of an appropriation to pay the salary.

The foregoing provisions do not specify that an appropriation for state employee salaries can be made only in the budget act, and in some instances state employee salaries currently are paid from continuing appropriations,[15] but appropriations for most state employee salaries traditionally have been adopted as part of the annual budget act. In any event, the constitutional and statutory provisions set forth above clearly require that some applicable appropriation be available before a state employee's salary actually may be paid from public funds.

In addition to the provisions just discussed, Government Code sections 1231 and 1231.1 address the effect of a budget impasse upon the employment relationship between the state and its employees and the payment of

---

[15]As CSEA points out, under current law the salaries of some state employee are payable from a continuing appropriation. (See, e.g., Ins. Code, § 11770 et seq. ["The assets of the [State Compensation Insurance Fund] shall be applicable . . . to the payment of the salaries and other expenses charged against it . . . ."]; see also *Board of Osteopathic Examiners v. Riley* (1923) 192 Cal. 158 [218 P. 1018] [ordering Controller to pay salaries of members of the Board of Osteopathic Examiners pursuant to a continuing appropriation from a special fund into which fees paid by osteopaths were deposited].)

salary for work performed during a budget impasse. As previously noted, section 1231, enacted in 1969, provides: "No state officer or employee shall be deemed to have a break in service or to have terminated his or her employment for any purpose, nor to have incurred any change in his or her authority, status, or jurisdiction or in his or her salary or other conditions of employment, solely because of the failure to enact a budget act for a fiscal year prior to the beginning of that fiscal year. [¶] A person entering state service on or after the beginning of a fiscal year and before the effective date of the budget act for that fiscal year and who otherwise is a state officer or employee, shall be deemed a state officer or employee from the time he or she entered state service, notwithstanding the failure to enact a budget act for that fiscal year." And section 1231.1, which derives from a provision first enacted as an urgency measure in 1976, provides: "Funds from each appropriation made in the budget act for any fiscal year may be expended to pay to officers and employees whatever salary that would have otherwise been received had the budget act been adopted on or prior to July 1, of that fiscal year."

By its terms, Government Code section 1231 establishes that the employment relationship between the state and state employees is *not* dependent upon the passage of the annual budget bill and continues to exist during a budget impasse, and further provides that the conditions of employment—including an employee's salary—remain in effect during the budget impasse. Contrary to the contention of the state employee interveners, however, section 1231 does *not* indicate a legislative intent to authorize *the actual payment* of salary to employees prior to the passage of a budget act that includes a requisite appropriation of funds for such salaries. Particularly when read in conjunction with Government Code sections 9610 and 1231.1, we believe that section 1231 reasonably must be interpreted to recognize that under state law the actual payment of a state employee's salary is dependent upon the availability of a duly enacted appropriation. Indeed, it is because of that limitation that section 1231.1 establishes that once a budget ultimately is enacted, appropriations included in that budget are available to pay for work performed during the budget impasse. If section 1231 afforded employees the right actually to receive their full pay during a budget impasse, there would have been no reason to provide in section 1231.1 that funds from appropriations in the budget act "may be expended to pay to . . . employees *whatever salary that would have otherwise been received had the budget act been adopted on or prior to July 1, of that fiscal year*." (Italics added.)[16]

Accordingly, we conclude that in light of article XVI, section 7, of the California Constitution, and Government Code sections 12440, 9610, 1231,

---

[16]Although the state employee interveners contend that one of the "conditions of employment" protected by Government Code section 1231 during a budget impasse is a public employee's right to the *timely* payment of salary, they have not cited any statute or other

and 1231.1, the employment rights of state employees reasonably must be viewed as including a condition that the actual payment of an employee's salary is dependent upon the existence of an available appropriation.

In arguing against this conclusion, CSEA points to a footnote in this court's decision in *Jarvis v. Cory* (1980) 28 Cal.3d 562, 574, footnote 6 [170 Cal.Rptr. 11, 620 P.2d 598], which it claims supports its contention that state employees are entitled to receive payment of their salaries during a budget impasse. In our view, however, the footnote in *Jarvis v. Cory* upon which CSEA relies actually confirms the common understanding that state employees whose salaries are paid from appropriations in the annual budget act do not have a right, under state law, to receive immediate payment of their salary prior to the enactment of a budget.

In *Jarvis v. Cory, supra,* 28 Cal.3d 562, this court rejected a claim that a legislative enactment that authorized a lump-sum payment to state employees at the end of a fiscal year constituted a payment of "extra compensation" and as such was prohibited by article IV, section 17 of the California Constitution. In the course of upholding the validity of the legislation, the decision in *Jarvis v. Cory* included a footnote—footnote 6—that reads in full: "Although no appropriation for payment of salaries existed from July 1 to July 6, when the budget bill was finally passed, state employees faithfully attended work as usual during that period and were ultimately compensated

---

authority that specifically creates such a right. Labor Code section 204, which imposes an obligation of timely payment of wages upon employers in California generally, is not applicable to the payment of wages of employees who are directly employed by the state. (Lab. Code, § 220.) In any event, assuming that state employees generally enjoy a right, protected by the contract clause, to the timely payment of earned salary when appropriated funds are available to pay such salary, the state employee interveners have not persuasively demonstrated how such a general right to the timely payment of salary properly can apply during the period of a budget impasse, in light of the constitutional and statutory provisions we have discussed above.

For similar reasons, we find inapposite the numerous out-of-state cases that have considered the validity of a variety of "pay lag" and mandatory furlough measures. (See, e.g., *Univ. of Hawaii Professional Assembly v. Cayetano* (9th Cir. 1999) 183 F.3d 1096; *Mass. Community College Council v. Com.* (1995) 420 Mass. 126 [649 N.E.2d 708].). In general, these cases hold that a variety of state statutes that postponed the payment of employee salaries for one or more pay periods or that imposed mandatory furloughs without pay in order to save the state money during a budget crisis were invalid under the impairment-of-contract clause. None of the cases, however, involved the question whether public employees have a right, protected by the contract clause, to obtain timely payment of salary *in the absence of an available appropriation.* Indeed, in *Mass. Community College Council, supra,* 649 N.E.2d 708, the court specifically noted that "[t]here is no suggestion that the Legislature had not appropriated funds to pay the compensation called for under the collective bargaining agreements. Indeed, the furlough program was designed to generate revenue surpluses that would be available at the end of the fiscal year to help balance the budget." (649 N.E.2d at pp. 711-712.) Accordingly, we do not find these decisions on point.

as if their salaries had been established from the beginning of the fiscal year. This procedure has practically become an annual event, and illustrates not only that state employees have often worked without guarantee of salary yet ultimately received compensation, but also that in interpreting article IV, section 17 [the state constitutional provision barring 'extra compensation . . . after service has been rendered '], a sensible recognition of the imperfect and cumbersome machinery of state government has long been the prevailing practice. Strict interpretation would impose needless constraints on the ability of the state to function, and we find unacceptable the proposition that the Constitution was intended to annually bring state government to a grinding halt." (28 Cal.3d at p. 574, fn. 6.)

Footnote 6 in *Jarvis v. Cory, supra,* 28 Cal.3d 562, 574, clearly reflects the court's view that the "extra compensation" clause of the California Constitution should not be interpreted "to annually bring state government to a grinding halt" by barring the Legislature from authorizing the payment of past-accrued state employee salaries from appropriations that are included in a budget bill enacted after the work in question has been performed. In our view, however, there is nothing in this footnote to suggest that the court in *Jarvis v. Cory* anticipated that state employees would receive payment of their salaries prior to enactment of the budget bill. On the contrary, because the footnote refers to state employees who "have often worked without guaranty of salary" and observes that such employees "were *ultimately* compensated as if their salaries had been established from the beginning of the fiscal year" (28 Cal.3d at p. 574, fn. 6, italics added), we believe this footnote reasonably must be understood simply to confirm the common understanding that, as a matter of state law, the Controller may pay the salaries of state employees only after an applicable appropriation has been enacted. Other cases reflect the same understanding. (See, e.g., *California State Employees' Assn. v. Flournoy* (1973) 32 Cal.App.3d 219, 231 [108 Cal.Rptr. 251] ["[I]t is clear that [the practice of the Board of Regents] with regard to personnel salary increases has been to apply for, and obtain, a legislative appropriation with which to pay the salary increases"]; *Theroux v. State of California* (1984) 152 Cal.App.3d 1, 9 [199 Cal.Rptr. 264] ["[The State and the Controller] have argued that the funds remaining from the initial appropriation are inadequate to pay appropriate salary adjustments to all entitled employees once the restrictions are removed [as required by the *Theroux* decision]. However, should that prove so, we must 'presume the Legislature will give meaning to our ruling and "that the proper steps will be taken to appropriate the amount required" to pay such [adjustments].' "].)

Although we thus conclude that state employees have no right under the contract clause to the *immediate* payment of salary in the absence of a duly

enacted appropriation for payment of such salaries, it should be emphasized that this conclusion does *not* mean that state employees who work during a budget impasse do so as "volunteers," not entitled to compensation, as suggested by the trial court. Government Code section 1231 expressly provides for the continuation of the employment relationship between the state and its employees during a budget impasse, without any change "in salary or other conditions of employment." In light of this provision, and the holdings in past cases that a public employee's "right to the payment of salary earned" is "protected by the contract clause of the Constitution" (*Kern v. City of Long Beach, supra,* 29 Cal.2d 848, 853), we conclude that employees who work during a budget impasse obtain a right, *protected by the contract clause,* to the ultimate payment of salary that has been earned. As indicated by the above quoted passage in *Jarvis v. Cory, supra,* 28 Cal.3d 562, 547, footnote 6, in the past the Legislature always has paid employees for work performed during such a period, and Government Code section 1231.1 now makes it clear that when a budget ultimately is enacted with appropriations for salaries, these appropriations are available for payment of work performed during the budget impasse.[17]

Nonetheless, because the California Constitution and the applicable statutes establish that the Controller is not authorized actually to pay salaries to state employees in the absence of a duly enacted appropriation, that condition or qualification on the right to compensation necessarily comprises one term or condition of employment that is an integral part of a state worker's employment rights that are protected by the constitutional contract clause. Accordingly, we conclude that, contrary to the contention of CSEA, the state constitutional contract provision does not afford state employees the right to obtain the actual payment of salary from the treasury prior to the enactment of an applicable appropriation.[18]

---

[17]We have no occasion in this case to consider what remedy or remedies state employees may have in the unlikely event that the state fails to pay employees fully for work performed during a budget impasse, or whether any remedy would include compensation for any loss sustained as a result of a delay in payment. As explained above, however, we conclude that employees who work during a budget impasse obtain the right, protected by the contract clause, to the ultimate payment of their earned salary, and nothing in the Court of Appeal's opinion should be read to suggest that these employees properly may be found to have "assumed the risk" that they never will be paid for such work.

[18]Because we conclude that state employees do not have a contractual right to receive payment of their salaries prior to the enactment of an applicable appropriation, we have no occasion to determine whether—in the event these employees possessed such a contractual right—the Controller would have the authority to pay their salaries in the absence of an appropriation. (Cf. *Tevis v. City & County of San Francisco* (1954) 43 Cal.2d 190, 200 [272 P.2d 757]; *Theroux v. State of California, supra,* 152 Cal.App.3d 1, 7-9.)

## 2. *Dills Act*

CSEA argues alternatively that if, under state law, an appropriation is necessary for the payment of state employee salaries, as we have determined above, we should conclude that whenever the Legislature has approved a state employee memorandum of understanding pursuant to the provisions of the Ralph C. Dills Act (Dills Act) (Gov. Code, § 3512 et seq., formerly known as the State Employer-Employee Relations Act), such approval in itself properly must be viewed as, in effect, a "continuing appropriation" of the funds necessary to meet the salary obligations set forth in the memorandum of understanding, and thus that the payment of salaries of employees covered by such a memorandum of understanding may be made in the absence of a budget act appropriation. As we shall explain, in our view the provisions of the Dills Act fail to support CSEA's argument.

As the Court of Appeal explained in *Department of Personnel Administration v. Superior Court* (1992) 5 Cal.App.4th 155, 180-181 [6 Cal.Rptr.2d 714]: " 'Although the [Dills Act] affords state employees significant new rights, the Legislature at the same time placed definite limits on the scope of representation and retained substantial control over state employee compensation and many other terms and conditions of state employment. . . . The act . . . provides that as to matters within the scope of representation, a memorandum of understanding requiring the expenditure of funds does not become effective *unless it is approved by the Legislature in the annual Budget Act* (§ 3517.6); under this provision, virtually all salary agreements are subject to prior legislative approval.' " (Original italics and fn. omitted, new italics added.)[19]

Although Government Code section 3517.6 specifically provides that any provision of a memorandum of understanding that requires the expenditure of funds—as obviously does a provision embodying a salary agreement— "shall not become effective unless approved by the Legislature *in the annual Budget Act*" (italics added), CSEA argues that it would undermine the

[19]Government Code section 3517.6 states in relevant part: "If any provision of the memorandum of understanding requires the expenditure of funds, those provisions of the memorandum of understanding shall not become effective unless approved by the Legislature in the annual Budget Act. If any provision of the memorandum of understanding requires legislative action to permit its implementation by amendment of any section not cited above [i.e., specified statutory provisions that may be superseded by a conflicting provision of a memorandum of understanding], those provisions of the memorandum of understanding shall not become effective unless approved by the Legislature."

Government Code section 3517.7 provides in relevant part: "If the Legislature does not approve or fully fund any provision of the memorandum of understanding which requires the expenditure of funds, either party may reopen negotiations on all or part of the memorandum of understanding."

effectiveness of a multiyear memorandum of understanding if the Legislature, after initially approving such a memorandum, retained the right during the period covered by the memorandum to refuse to appropriate in a subsequent annual budget the funds required by the agreement. We have no occasion in this case to determine what remedy, if any—other than the reopening of negotiations prescribed by section 3517.7 (see fn. 19, *ante*)—state employees or their representatives may have if the Legislature effectively repudiates one or more provisions of a multiyear memorandum of understanding by declining to appropriate the necessary funds to meet its obligations under the memorandum of understanding. In light of the explicit language of section 3517.6 ("unless approved by the Legislature *in the annual Budget Act*" (italics added)), however, we cannot agree that the Legislature's initial approval of the memorandum of understanding in a nonbudget act, or its appropriation of funds in one or more (but not all) of the annual budgets of a multiyear contract, properly can be viewed as a continuing appropriation authorizing the Controller to pay salaries set forth in the memorandum of understanding in a new fiscal year without enactment of an applicable appropriation in that year's budget act.[20]

### 3. *Equity and Policy Reasons*

Finally, CSEA argues that state employees, like all other employees, should be able to work secure in the knowledge that they will *timely* receive their full salaries, and that, *as a matter of equity and sound public policy*, "[s]tate employees who report to work during a budget impasse and continue to faithfully serve the people of the State of California deserve nothing less."

[20]The case of *Association of Surrogates v. State* (1991) 78 N.Y.2d 143 [573 N.Y.S.2d 19, 577 N.E.2d 10], upon which CSEA relies, does not support a contrary conclusion. In *Association of Surrogates*, the New York Court of Appeals held that under the applicable New York statute, the legislature's ratification of a three-year public employee collective bargaining agreement constituted "approval" of the entire three-year obligation expressed in the contract and precluded the legislature from thereafter altering the provisions of the agreement by unilaterally instituting a "pay lag" under which, in one of the years covered by the agreement, employees were to be paid for only 50 rather than 52 weeks of work, with the withheld amounts to be repaid to the employees upon the termination of their employment, at the employees' then current rate of salary. (577 N.E.2d at pp. 12-16.) Although the court in *Association of Surrogates* concluded that the newly adopted pay lag mechanism was invalid, the court did not suggest that the legislature's approval of the multiyear agreement authorized the actual payment of funds from the treasury without an applicable annual appropriation. On the contrary, the court in that case expressly stated that "[a]s with any other expenditure of funds by the State, money for public employees' salaries must be appropriated by the Legislature *each year*" (*id.* at p. 12, italics added), and further noted that "[p]laintiffs do not dispute the necessity for a legislative appropriation before State funds may be paid as salary to public employees." (*Ibid.*) Thus, the court in *Association of Surrogates* did *not* hold that the legislature's approval of a multiyear agreement properly could be viewed as constituting a continuing appropriation obviating the need for an annual appropriation.

We could not agree more with this proposition. The California Constitution contemplates that the Legislature will pass a budget in time to provide timely payment of all of the state's regular obligations, and public employees certainly are treated inequitably when, through no fault of their own, they are deprived of the prompt payment of their salaries. Furthermore, we also agree with CSEA that, as a matter of policy, this situation is almost certainly detrimental to the state as an employer because, "if state employees must confront financial uncertainty each summer as to whether they will receive their full and regular salaries, they [may well] look elsewhere for employment." But these points, however well founded, simply highlight the crucial importance of timely enactment of a budget bill or some other legislative measure appropriating funds for the payment of state employee salaries. Our agreement with these sentiments affords us no authority to disregard well-established principles of state law that authorize the payment of state employee salaries only when there is an applicable and available appropriation.

### B. *Federal Law*

#### 1. *Federal Contract Clause and Due Process Clause*

As explained above, we have concluded that state employees have no contract right, under California law, to the *immediate* payment of salary during a budget impasse, because one of the conditions that is part of their employment contract is that the Controller is authorized to pay their salary only if there is a duly enacted appropriation from which such payment may be made. For this reason, the federal constitutional contract clause does not provide any support for the employees' claim, and similarly there is no violation of the federal due process clause, because the state has not deprived the employees of a right they otherwise possess.

#### 2. *Fair Labor Standards Act*

■ The Court of Appeal held that under the federal supremacy clause, California nevertheless is required to comply with the FLSA, which requires *timely* payment of those wages required by the federal act, that is payment of such wages on the regular payday of those workers to whom the minimum wage and overtime compensation provisions of the FLSA apply. In a brief in this court, the Controller takes the position that the Court of Appeal's opinion did not purport to determine the amount of wages the FLSA requires an employer to pay on the regular payday—that is, whether the FLSA requires payment of the employee's *full* regular wages, or payment only of wages computed at the minimum wage rate—and the Controller suggests

that this court need not resolve that issue either. The state employee interveners, however, read the Court of Appeal's opinion as holding that the FLSA requires only the prompt payment of minimum wages and overtime compensation. Although the opinion is somewhat ambiguous on this point,[21] we believe in any event that it is appropriate to clarify our understanding of what the FLSA requires with regard to the amount of salary payments that must be made during a budget impasse, so as not to leave the Controller without guidance on this issue.

We begin with the governing language of the FLSA. The basic minimum wage provision of the act provides in relevant part: "(a) . . . [¶] Every employer shall pay to each of his employees who in any workweek is . . . employed in an enterprise engaged in commerce . . . , wages at the following rates: [¶] (1) . . . not less than [the current designated minimum wage]." (29 U.S.C. § 206.) The relevant overtime compensation provision of the FLSA provides in relevant part: "(a)(1) Except as otherwise provided in this section, no employer shall employ any of his employees . . . for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed." (29 U.S.C. § 207.) These minimum wage and overtime compensation provisions of the FLSA apply to most, although by no means all, state employees; thus, for example, those employees "employed in a bona fide executive, administrative, or professional capacity" generally are "exempt" from—that is, they do not enjoy the benefit of—these provisions of the FLSA. (29 U.S.C. § 213(a)(1).)[22] Employees to whom the minimum wage and overtime compensation provisions of the FLSA apply are generally referred to as "nonexempt employees," and employees to whom those provisions do not apply are referred to as "exempt employees."

Although the United States Supreme Court has not yet directly addressed the issue whether the FLSA requires prompt payment of a nonexempt

---

[21]On the one hand, the Court of Appeal states in a footnote: "We do not resolve the extent to which the FLSA applies to the different categories and classes of state employees, or the extent to which the compensation required under the FLSA may fall short of any state employee's full salary. These questions have not been presented to us, and we do not address them." (*White v. Davis I, supra,* 108 Cal.App.4th 197, 223, fn. 9.) On the other hand, in another footnote the Court of Appeal states: "Citing *Donovan v. Crisostomo* (9th Cir. 1982) 689 F.2d 869, 876, the state employee interveners argue under the FLSA, employees who work overtime must receive the requisite overtime wages plus their full straight time pay. However, they do not cite any authority that the FLSA requires the full payment of straight time wages in all circumstances, and we are unaware of any such authority." (*White v. Davis I, supra,* 108 Cal.App.4th at p. 228, fn. 12.)

[22]No issue has been raised in this case—in either the trial court or on appeal—regarding which particular state employees (or state employee positions) are subject to the minimum wage and overtime compensation provisions of the FLSA and which employees are exempt from such provisions, and thus we have no occasion to address that issue here.

employee's wages or overtime compensation, the lower federal courts consistently have interpreted the act to require the prompt payment of minimum and overtime wages. (See, e.g., *Biggs v. Wilson, supra,* 1 F.3d 1537; *Olson v. Superior Pontiac-GMC, Inc.* (11th Cir. 1985) 765 F.2d 1570, 1579, as mod., 776 F.2d 265, 267; *United States v. Klinghoffer Bros. Realty Corp.* (2d Cir. 1960) 285 F.2d 487, 491; see also *Brooklyn Bank v. O'Neil* (1945) 324 U.S. 697, 707 & fn. 20, 709 [65 S.Ct. 895, 902, 903, 89 L.Ed. 1296].)

In *Biggs v. Wilson, supra,* 1 F.3d 1537, the Ninth Circuit addressed the question whether a state's failure to pay its employees on their regular payday *during a budget impasse* violates the FLSA. In *Biggs,* California highway maintenance workers were not paid any wages on their regular payday (July 16, 1990) because of a budget impasse and did not receive wages for that pay period until July 30-31, when the state budget finally was enacted and signed into law. Thereafter, the workers brought suit against the state under the FLSA, and the Ninth Circuit held that the state's failure to pay the employees on their regular payday violated the FLSA, concluding that the existence of a state constitutional provision prohibiting the payment of funds in the absence of an available appropriation did not excuse the state's obligation to comply with the requirements imposed by federal law. (1 F.3d at pp. 1543-1544.)

There is some ambiguity in the language of the opinion in *Biggs* as to whether that decision purported to hold that the FLSA requires the prompt payment of an employee's *regular* salary or only the prompt payment of wages *based on the minimum wage.* Some language in the opinion, at least at first blush, appears to support the position that the FLSA requires the prompt payment of an employee's regular salary. Thus, for example, the trial court order that was affirmed in *Biggs* states in part that " '[i]t is therefore declared that defendant's failure to issue plaintiffs' paycheck when due violates the Fair Labor Standards Act.' " (*Biggs v. Wilson, supra,* 1 F.3d at p. 1538, fn. 2.) Further, at the conclusion of the opinion in *Biggs,* the court of appeals stated: "We therefore hold that state officials' failure to issue the class's paychecks promptly when due violates the FLSA. Paychecks are due on payday. After that, the minimum wage is 'unpaid.' " (1 F.3d at p. 1544.)

When the opinion in *Biggs v. Wilson, supra,* 1 F.3d 1537, is read as a whole, however, it is clear that the opinion properly must be understood as holding that an employer complies with the FLSA so long as it pays those employees who are subject to the FLSA *at the minimum wage rate* on payday, and not that the FLSA requires an employer to pay employees their regular wage on payday. The basic reasoning of the *Biggs* decision is that the *minimum wage* required by the FLSA must be paid promptly, not that the

FLSA requires the payment of an employee's salary above the minimum wage. In describing the provisions of the FLSA, the court's opinion in *Biggs* states: "The FLSA provides for the recovery of unpaid minimum wages, unpaid overtime compensation, and liquidated damages . . . . These provisions necessarily assume that wages are due at some point, and thereafter become unpaid." (1 F.3d at p. 1539, fn. omitted.) Nothing in the FLSA provides for the recovery of unpaid *regular* wages above the minimum wage. Furthermore, after explaining why it believed the language of the statute itself was inconsistent with the state's contention that the statute contained no prompt payment requirement, the opinion in *Biggs* states: "Holding that the FLSA is violated *unless the minimum wage* is paid on the employee's regular payday also comports with such case law as there is." (*Id.* at p. 1541, italics added.) Finally, in rejecting the argument that the existence of a budget impasse should relieve the state of its obligation under the FLSA, *Biggs* states: "The FLSA does not require California to pass a budget on time; it only requires California to do what all employers must do—*pay its employees the minimum wage on payday.*" (1 F.3d at p. 1543, italics added.)

Accordingly, we conclude that, under *Biggs*, the state is required to comply with the FLSA during a budget impasse, but that the state satisfies the requirements of the FLSA by paying nonexempt state employees (who do not work overtime) at the minimum wage rate for the straight-time hours (that is, nonovertime hours) worked by those employees during the pay period. For nonexempt employees who do not work overtime, the FLSA does not require the prompt payment of *full* salary.

By contrast, under the applicable federal regulation (29 C.F.R. § 778.315 (2002)), whenever a nonexempt employee works overtime, the FLSA requires the employer to pay the employee his or her *full regular salary* for the employee's straight time as well as at least one and one-half times the employee's regular salary for overtime hours worked. (See *Fidelity Federal Sav. & Loan Assn. v. de la Cuesta* (1982) 458 U.S. 141, 153 [102 S.Ct. 3014, 3022, 73 L.Ed.2d 664] ["Federal regulations have no less pre-emptive effect than federal statutes."].) The applicable regulation states in this regard: "Overtime compensation, at a rate not less than one and one-half times the regular rate of pay must be paid for each hour worked in the workweek in excess of the applicable maximum hours standard. *This extra compensation for the excess hours of overtime work under the Act cannot be said to have been paid to an employee unless all straight time compensation due him for the nonovertime hours under his contract* (express or implied) *or under any applicable statute has been paid.*" (29 C.F.R. § 778.315 (2002), italics added.) In *Donovan v. Crisostomo, supra,* 689 F.2d 869, 876, the court explained the rationale underlying this regulation, noting that without such a

limitation "[a]n employer could effectively eliminate the premium paid for overtime by [reducing an employee's] straight time wages in an amount equal to or greater than the overtime premium."

In sum, in order to comply with the FLSA, the state, during a budget impasse, must timely pay nonexempt employees who do not work overtime at least at the minimum wage rate for all straight hours worked by the employee, and must timely pay nonexempt employees who work overtime their full salary for all straight time worked plus one and one-half times their regular rate of pay for overtime.

In a declaration accompanying the opposition to the request for a preliminary injunction filed in the trial court, the Controller maintained that it was not feasible to determine and adjust all of the payments to state employees "to only pay the federally required minimum wage instead of the wages to which each employee is entitled prior to [the applicable] payroll deadlines." The Controller asserted it was thus necessary to pay all state employees covered by the FLSA their full regular wages in order to assure compliance with the requirements of that act. The trial court never addressed this claim, and the Court of Appeal took note of the question but declined to address it for the first time on appeal. (*White v. Davis I, supra,* 108 Cal.App.4th 197, 231, fn. 13.)

In a supplemental brief filed in this court, the Controller has reiterated the claim that it is infeasible or impossible for the state to timely pay only the minimum compensation required by the FLSA, emphasizing the state's current use of a "negative payroll" system and the difficulty of "segregating those employees who worked overtime from those who did not work overtime" and the further difficulty of "determining whether an employee worked a full 40 hours each week or may have worked less due to being on unpaid leave or being ill," and of making such determinations quickly enough to comply with the timely payment requirements of the FLSA. On the record before us we have no means of evaluating or resolving the Controller's factual claim of impossibility, but even if it is administratively infeasible, given the state's current payroll system, for the state, prior to preparing an individual employee's paycheck, to determine with certainty whether a particular nonexempt employee will or will not work overtime during a given pay period or to determine the exact number of straight-time hours the employee will work, we are somewhat skeptical of the contention that the state would be found to have violated the FLSA if, during a budget impasse, the state (1) pays full regular wages and overtime compensation to those nonexempt employees who it reasonably anticipates will work overtime during a given pay period, (2) pays minimum wage rate for all

straight-time hours an employee is scheduled to work during the pay period to those nonexempt employees who it reasonably anticipates will not work overtime during a given pay period, and (3) in the following pay period, pays employees all additional sums that are due under the FLSA for the prior pay period based on information that the state obtains through reporting forms that it collects on or immediately following the preceding payday. (Cf. *Walling v. Harnischfeger Corporation* (1945) 325 U.S. 427, 432-433 [65 S.Ct. 1246, 1249, 89 L.Ed. 1711] ["*Section 7(a)* [*the overtime provision of the FLSA*] *does not require the impossible.* If the correct overtime compensation cannot be determined until some time after the regular pay period the employer is not thereby excused from making the proper computation and payment. *Section 7(a) requires only that the employees receive a 50% premium as soon as convenient and practicable under the circumstances.*" (Italics added.)]; see also 29 C.F.R. § 778.106 (2002) ["When the correct amount of overtime compensation cannot be determined until some time after the regular pay period . . . the requirements of the Act will be satisfied if the employer pays the excess overtime compensation as soon after the regular pay period as is practicable. Payment may not be delayed for a period longer than is reasonably necessary for the employer to compute and arrange for payment of the amount due and in no event may payment be delayed beyond the next payday after such computation may be made."].)

In any event, as already noted, the Controller's claim of infeasibility was not fully litigated below, and thus we do not believe it would be appropriate to attempt to definitively resolve the claim at this juncture. It is sufficient at this point to make clear that, by virtue of the supremacy of federal law, the state is obligated to comply with the minimum requirements of the FLSA during a budget impasse, notwithstanding the lack of an available appropriation.

## V

For the reasons set forth in part III, *ante*, we conclude that the Court of Appeal erred in upholding in part the preliminary injunction granted by the trial court. The judgment of the Court of Appeal is reversed insofar as it upheld in part the preliminary injunction, and the matter is remanded to the Court of Appeal with directions to set aside the preliminary injunction in its entirety. Further, as explained above (see fn. 14, *ante*, p. 563), without ruling on the additional issues resolved by the Court of Appeal that we have not addressed in our present opinion, we order that the Court of Appeal's opinion be published in the Official Reports. (Cal. Rules of Court, rule 976(d).)

Kennard, J., Baxter, J., Werdegar, J., Chin, J., Brown, J., and Moreno, J., concurred.